RECEIPT # 102681
AMOUNT $ 250.00
SUMMONS ISS. 42 FILED
LOCAL RULE 4.1 CLERKS OFFICE
WAIVER OF FORM
MCF ISSUED 2005 MAR 11 P 12: 46
BY DPTY CLK
DATE 3-11-05 DISTRICT COURT
DIST. OF MASS.

# UNITED STATES DISTIRCT COURT

# DISTRICT OF MASSACHUSETTS

CIVIL DOCKET NO.

# 05 - 1047 MLW

|  |  |  |
|---|---|---|
| PETER TINKHAM | ) | |
| JULIET ALEXANDER | ) | JURY TRIAL DEMAND |
| SAMANTHA TINKHAM | ) | Referred to MJ  JL Alexander |
| **PLAINTIFFS** | | |

### V.

|  |  |
|---|---|
| DOREEN R. KELLY, BARRY L. MINTZER, JEAN CURTIS LOUD, | ) |
| ROBERT L. DOYLE, DONNA KYED, MARGARET VERRET, | ) |
| JOAN BERNHEIMER, JUDI ALBERTON, CLAIRE JACKSON, | ) |
| ERIN L. SENGES, BARBARA A. HAWKES-SULLIVAN, | ) |
| BARNEY KEEZELL, STEPHANIE THOMAS, ERICA COHEN | ) |
| AND KENNETH PONTES. | ) |
| **DEFENDANTS** | |

PLAINTIFFS, pro se, allege the following:

1. Plaintiffs Peter Tinkham, Juliet Alexander and Samantha Tinkham,

pro se, bring this action to obtain redress for the deprivation and conspiracy to

deprive Plaintiffs of their federally protected rights, for unlawful conversion and

conspiracy to unlawfully convert Plaintiffs' property through a pattern of

racketeering activity. The incidents upon which Plaintiffs' lawsuit is based

occurred as a direct result of the malicious, intentional, deliberate, reckless and

negligent conduct by all of the above-named Defendants who conspired, inter

alia, to coerce and extort Plaintiffs of their property and their peace of mind. This

conspiracy culminated in the malicious and retaliatory prosecution of Plaintiffs to

punish them for the exercise of their First Amendment rights. Therefore, this

action also seeks redress for retaliatory prosecution, for intentional infliction of

emotional distress, for defamation and for educational malpractice as hereinafter alleged.

2. This action is brought to seek fair compensation for damages and injuries as harmful as they are irreparable, including financial injury, humiliation, outrage, and mental suffering and anguish inflicted upon Plaintiffs as a result of the wrongful acts of the Defendants.

3. This action is also filed to ensure that these Defendants and others are deterred from engaging in such wrongful conduct in future. In addition, Plaintiffs seek to have statutes 51/A and 51/B of the General Laws of the Commonwealth of Massachusetts and the relevant policies and procedures of its creature agency, the Massachusetts Department of Social Services, declared unconstitutional and enjoined.

## JURISDICTION

4. This Court has subject matter jurisdiction pursuant to:

a] 18 U.S.C. section 1961 et seq., because this is an action for damages and other appropriate relief arising under the Racketeer Influenced and Corrupt Organization Act (RICO);

b] 28 U.S.C. section 1331 because this case arises under the Constitution and laws of the United States;

c] 28 U.S.C. section 1343 because this action also seeks redress and damages for violations of the Due Process and Equal Protection provisions of the United States Constitution and, in particular, the rights protected under the First, Third, Fourth,

Fifth, Sixth, Ninth and Fourteenth Amendments thereof, pursuant to 42 U.S.C. sections 1983, 1985 and 1986;

d] 28 U.S.C. section 1232 since there is diversity of citizenship and since this is also a civil action involving, exclusive of interests and costs, a sum in excess of $75,000.00.

5. Plaintiffs further invoke the pendant jurisdiction of this Court to hear and decide claims, hereinafter alleged, constituting malicious prosecution, abuse of process, prima facie tort, conspiracy tort, defamation, intentional infliction of emotional distress, educational malpractice, negligence and gross negligence under the laws of the Commonwealth of Massachusetts.

## VENUE

6. Venue is properly situated in the District of Massachusetts pursuant to the provisions of 18 U.S.C. section 1965 (a) and 28 U.S.C. section 1391 (b) and (c). Venue is also proper since the causes of action alleged in this Complaint occurred in, and all of the Defendants reside in, Massachusetts.

## THE PARTIES

7. Plaintiffs: Peter Tinkham, Juliet Alexander, and Samantha Tinkham are citizens of the State of Maine and reside in Franklin County in that State.

8. Plaintiffs Tinkham and Alexander, are the parents of Samantha Tinkham, who is a 7th grade student enrolled at Our Lady of Victory Catholic School.

9. Plaintiffs Tinkham and Alexander were employed from 1980-85 as subcontractors trained and authorized by the Massachusetts Department of Social Services to care for serious, high-risk adolescents. They provided a 24 hour "structured day" program for

each client, kept daily logs, made weekly reports, attended weekly and monthly meetings and training seminars with qualified experts and advocated for each of their six clients with therapists, social workers, and public school officials to ensure that the proper, legal benefits were provided for their clients who presented with disorders ranging from juvenile delinquency to suicidal anorexia.

10. In 1992 they took custody of a previous client's two-year old child at the mother's express insistence and from conditions noteworthy for indescribable squalor and parental neglect.

11. Plaintiffs proceeded to adopt and to raise this child, advocating for her interests as they had advocated for her mother when she was consigned to their care in 1984.

12. Defendants:  Defendants are or were employees or agents of the Sharon Public Schools, to wit., Jackson, Doyle, Loud, Bernheimer, Kelly, Alberton, Verret, Kyed, and Mintzer; employees of the Massachusetts Department of Social Services, to wit., Pontes, Cohen, Thomas, Keezell, Hawkes-Sullivan, and Senges; residents of the Commonwealth of Massachusetts; and, at all times relevant to this Complaint and in all their actions herein described, acting under color and pretense of law, pursuant to their authority as employees of government agencies or pursuant to their joint activity with said employees.

13. All Defendants are sued in their individual capacities.

14. Defendant Kelly, who was at all times relevant to this Complaint, Principal of the Cottage Street Elementary School and, as such, responsible for the delivery of educational services to Plaintiffs' child, acting individually and in concert with the other principal wrongdoers, to wit, Defendants Mintzer, Doyle, Loud, Verret and

4

Kyed; with her co-conspirators, to wit, Defendants Bernheimer, Alberton, Senges, Hawkes-Sullivan; and aided and abetted by Defendants Thomas, Keezell, Cohen, Pontes and Jackson, initiated and directed, with the indispensable aid of Defendant Mintzer, all of the harmful conduct which irreparably injured Plaintiffs and deprived them of their rights and their property.

15. None of the named Defendants is entitled to immunity, qualified or otherwise, for the following reasons:

   a) Defendants recklessly violated Plaintiffs' clearly established constitutional rights which a reasonable person would have known and recognized.

   b) Defendants took the hereinbelow described actions with malicious and vindictive intent to cause irreparable harm to Plaintiffs and to cause the deprivation of their property and their Constitutional rights.

   c) Defendants acted within their ministerial capacities and had absolutely no discretion to act as they did.

   d) The tactics employed by Defendants in order to specifically deprive Plaintiffs of their property and their constitutional rights were so extreme that no reasonable person would accept them as lawful.

   e) Defendants maliciously and vindictively instigated prosecution of manufactured charges in direct retaliation for Plaintiffs' expression of their First, Fifth and Ninth Amendment rights.

STATEMENT OT THE CASE

16. By the time the wrongful conduct of the Sharon School Defendants commenced in March 2001, Plaintiffs had already spent 6 months attempting to persuade them to provide their daughter with a safe and productive learning environment.

17. Samantha had entered Sharon Public School in September 2000 with a cosmetic disfigurement. After being knocked unconscious on her very first day of school by a classmate, she spent the next six months going backwards academically, despite numerous parent-initiated conferences with her third grade teacher, Eileen Ford, who is not a Defendant in this action. Plaintiffs' letter dated December 2000, is attached hereto and incorporated by reference herein as Exhibit A.

18. The persecution and humiliation endured by Samantha at the hands of her classmates was constant and compounded by the unending pandemonium in her classroom. Controlling the pandemonium and putting an effective stop to the persecution and resulting academic tailspin was clearly beyond the ability of Mrs. Ford and clearly not part of the job description Defendant Kelly envisioned for herself.

19. In February, as a direct and proximate result of Defendant Kelly's incompetent management of the Cottage Street School, Samantha's metabolic disorder, which had caused her disfigured appearance, dramatically escalated in the classroom when she ripped almost all of the hair on the top of her head and piled it under her desk.

20. During a consultation with school officials shortly after this event, Defendant Kelly confided to Plaintiffs that she had known for months that their daughter had been isolated and shunned at lunch by her classmates on account of her appearance; that the lunch aide had often observed her to throw away her lunch uneaten, and had often observed her to be weeping uncontrollably at recess.

21. Plaintiffs closely questioned their daughter about these specific experiences at school, weighed her as a result of the conversation and noted a 12-pound weight loss. Recognizing the classic symptoms of anorexia, Plaintiffs engaged a psychiatrist, a therapist, and a nutrition expert and consulted with her pediatrician of nine years standing.

22. Acting on the recommendations of this medical team, Plaintiffs, in March temporarily removed their daughter from the Cottage Street School and sent her to Florida for a brief vacation with her grandparents. Plaintiffs informed Defendant Kelly by phone and by letter of this plan to give Samantha a few weeks rest to recover from this crisis.

23. Unbeknownst to Plaintiffs at this time were the following facts:

    a) This "crisis" had made them defacto members of a discrete category of parents who are intuitively and unreasonably despised by school principals and not a little feared.

    b) Their letter had engendered concern in Defendant Kelly that Plaintiffs, now fully appraised of the indignities their daughter had silently endured under her incompetent administration, might begin to make vocal and costly demands.

c) There is a custom of long standing in the Sharon Public Schools employed whenever there is a change in the status of a student and this change might reasonably be seen as a threat to a principal's financial bottom line. A determined attempt is made to enroll that child as a "special education student" whether or not the child has any perceived learning disability or is in need of anything more special than a quiet, orderly classroom and courteous classmates.

24. In March 2001, such a scheme was approved, ratified and condoned by Defendant Kelly's advisors and was immediately put into action by Defendant Kelly upon receipt of Plaintiffs' letter. Fearing that Plaintiffs posed a threat to her own financial bottom line and never losing sight for a moment of the axiom that governed all of her work-related activities, to wit, a dollar she can avoid spending to pacify disgruntled parents is a dollar she can spend on herself and her pet projects, Defendant Kelly now determined to enroll Samantha as a "special education student" by whatever means necessary.

25. What Plaintiffs did not realize at the time was that Defendant Kelly's understanding of the term "whatever means necessary" would include:

a) Retaliation against Samantha by a systematic undermining of her education at every turn in order to lay a predicate for special education should a battery of tests proposed by the school fail to locate a learning disability per se.

b) Harassment, reckless and unlawful violations of Plaintiffs'
medical and personal privacy, coercion, threats, conspiracy, mail
fraud, extortion, bribery, obstruction of the due administration of
justice and malicious prosecution in retaliation for the expression
of First Amendment rights, putting Plaintiffs at risk of losing
their daughter, their property and their liberty.

26. The defacto income Defendant Kelly realized as a direct and proximate result of
the wrongful conduct referenced above was the property of Plaintiffs and totaled
well over $75,000.00.

27. In late February 2002, after a year of illegal conduct, conspicuous for its
subjective ill will and shameless, unethical maneuvers, did not result in Plaintiffs'
consent to consign their daughter to the limbo of special education, Defendants
stepped up their campaign of attacks on Plaintiffs with increased venom.

28.  Together they collaborated to shape "documents" and "witness statements"
designed to implicate Plaintiffs in every conceivable form of misconduct that
could be alleged against unsuspecting parents.  Defendants were careful to
suppress every piece of favorable evidence that would bring their imposture to
light, including the very existence of the primary tutor they had assigned to
Samantha in November, a woman they could not suborn and a woman they knew
would refute each and every contemptible allegation.

29. Defendants then proffered this stew of bogus, and known by them to be bogus,
charges to Defendant employees of the Massachusetts Department of Social

Services who swallowed it without the least hesitation, thereby confirming their own invidious and discriminatory animus against charged parents per se.

30. Notwithstanding the outrageous libel and patently incredible assertions in Defendant Kelly's "report", so outrageous that only a reckless or determined person would have circulated them, Defendant Department of Social Services employees collaborated with Defendant Kelly et al., to further this malicious prosecution.

31. This collaboration, established beyond question from the administrative paper trail, gave rise to an arbitrary and lawless vendetta against Plaintiffs, fueled by the power of the State.

32. In March 2002, Plaintiffs were compelled to abandon their advocacy of their daughter's educational prerogatives and to give their undivided attention to the concerted attack on their privacy, on their integrity and on their liberty by Defendant employees of both the Sharon Public Schools and the Massachusetts Department of Social Services.

33. Plaintiffs were "investigated" on the credit of a general warrant, prosecuted by the self-serving arm of the Massachusetts Department of Social Services administrative police, found guilty by a low level bureaucrat without benefit of a trial, sentenced to life registration as "perpetrators" and burdened with a "service plan" that rivaled the original bogus charges for stupidity and malice.

34. This unjust prosecution, which was clearly erroneous, mutually inconsistent, unwarranted by the evidence and tainted beyond redemption by totem pole hearsay, to say nothing of malice, vindictiveness, intolerance, prejudice and

jealousy, was initiated against Plaintiffs in March 2002 and purportedly "closed" in March 2003 without any indication to Plaintiffs or for the "record" why it was opened.

## PLEADINGS

35. Plaintiffs re-allege and incorporate herein paragraphs 7-34 and 118-143 and further allege the following:

36. A pattern and practice of illegality by the named Defendants consisting of three separate criminal schemes or episodes, which authorized multiple predicate crimes that were planned, on-going and continuous over a 24 month period.

37. That each of the named Defendants' acts complained of were related to one another, shared the same methods, victims and intended results and were committed in furtherance of one penultimate objective, to wit, to convert Plaintiffs' property to their own use or for their own interests by whatever means necessary.

38. Scheme Number One, "Consent by Deceit," began in March 2001 and ended in July 2001. It consisted of predicate acts of mail fraud, wire fraud and conspiracy to dupe Plaintiffs into voluntarily relinquishing their property to Defendants. The Defendants involved in this scheme were Doyle, Mintzer, Kelly, Bernheimer, Alberton., and Verret.

39. Scheme Number Two, "Consent by Extortion" began in August 2001 and ended in January 2002. It consisted of predicate acts of mail fraud, conspiracy, extortion and obstruction of the due administration of justice to coerce Plaintiffs into compliance with Defendants demands for their property. The Defendants

involved in this scheme were Loud, Mintzer, Berheimer, Alberton, Kelly, Verret and Kyed.

40. Scheme Number Three "Consent by Malicious Prosecution" began in February 2002 and ended in March 2003. It consisted of predicate acts of mail fraud, conspiracy, extortion, obstruction of the due administration of justice and the impeding or subversion of a criminal investigation to compel Plaintiffs to allow the theft of their property and to prevent them from objecting to that theft. The Defendants involved in this scheme were Loud, Mintzer, Bernheimer, Kelly, Verret, Alberton, Kyed, Senges, Hawkes-Sullivan, Keezall, Thomas, Cohen, Pontes and Jackson.

41. That the Defendants named above, rejecting their obligations of fundamental honesty, fair play and right dealing during the relevant times and in furtherance of and for the purpose of executing these schemes to deprive Plaintiffs of their property, on several occasions used and caused to be used, the U.S. Mails.

42. That each predicate act of mail fraud was part of a pattern of racketeering intended to defraud Plaintiffs of their property and each anticipated Plaintiffs' reliance upon its contents and representations to their detriment.

43. That each predicate offense committed by named Defendants violates federal statutes, is chargeable under the laws of the Commonwealth of Massachusetts, and is punishable by more than one year in prison, to wit:

    a) Mail fraud, punishable under 18 U.S.C. section 1341;

    b) Wire fraud punishable under 18 U.S.C. section 1343;

    c) Extortion, punishable under 18 U.S.C. section 1951;

      d) Obstruction of the due administration of justice, punishable under 18 U.S.C. section 1503;

      e) Subversion of a criminal investigation punishable under 18 U.S.C. sections 1510 and 1952;

      f) Conspiracy, punishable under 18 U.S.C. section 1962(d).

44. That each act of mail fraud, each act of wire fraud, each act of extortion, each act of obstruction of justice, each act of impeding or subverting a criminal investigation and each act of conspiracy constitutes a separately punishable act and predicate offense under RICO within the meaning of 1961 (5).

45. That a schedule of every relevant act of mail fraud and wire fraud; every known act of extortion; obstruction of justice; impeding or subverting of a criminal investigation; and, conspiracy is itemized in Appendices E, D, C, B, and A, respectively, appended hereto and incorporated by reference herein.

46. That the pattern of racketeering activity alleged hereinabove was undertaken in connection with the subversion of a legitimate institution to wit, The Cottage Street School, which is an enterprise for purposes of RICO having an ascertainable hierarchical structure and personnel which functioned as a continuing unit with established duties that were conceptually distinct from the pattern of racketeering activity which Defendants conducted on its premises.

47. That this legitimate enterprise had the required nexus to interstate commerce in that it purchased and used services and supplies from outside the Commonwealth of Massachusetts and it conducts part of its business operations through interstate internet sites.

48. That Defendants were enabled to commit the multiple acts of predicate offenses enumerated in Appendices (A) – (E) by virtue of their positions in the enterprise; by virtue of their involvement with, or control over, the enterprise; and, because every one of the predicate offenses alleged is related to the legitimate activities of the enterprise.

## FACTUAL BASIS FOR CLAIM

### SCHEME #1

49. Defendant Kelly's initial move to corral Plaintiffs' daughter into the special education category was a demand on March 13, 2001, accompanied by a threat, on March 19th, that Plaintiffs accept the immediate provision of a "home tutor" to keep Samantha abreast of her studies.

50. Defendant Kelly made this "customary" demand unaware that the Code of Massachusetts Regulations, attached hereto as Exhibit B and incorporated by reference herein, no longer mandated automatic referral for a special education evaluation when a "home tutor" was provided, but instead created a right to unlimited home tutoring when authorized by the child's physician.

51. Defendant Kelly had unwittingly thrown a wrench into their scheme.  When Defendants Kelly and Mintzer realized their error, the new regulations having become operative only two providential months earlier, they sprang into immediate inaction.

52. Defendant Kelly was rendered mute and a tutor was not provided.  Plaintiffs, recognizing the benefit created by this new regulation would be of inestimable benefit to their daughter, and unaware that oblivion was now the terminus ad

quem of all their correspondence with Defendant Kelly and her associates, pressed the matter, making several petitions for a tutor:

    (a)    Plaintiffs, assuming Defendant Kelly's concern for their daughter's academic progress was genuine, are given the bum's rush by school personnel for six weeks before tutor Defendant Kyed appears at their home. She arrives without any oral or written notification from Defendant Kelly, who, as noted in paragraph 52, had lost all power of communication.

    (b)    Plaintiffs in conversations with Defendant Kyed discover she is an uncertified teacher's aide who arrives at 7:30 A.M. four days a week to instruct Samantha in arithmetic and history for one hour and they write a letter to Defendant Kelly inquiring about these anomalies which are inconsistent with sound academic progress.

53. Instead of a response from Defendant Kelly, Plaintiffs, on May 15, 2001, receive a letter from Defendant Kelly's attorney, Defendant Mintzer containing his protestations of concern for Samantha's education and implying that he is now in charge of special education evaluation in Sharon.

54. A few days later, Defendant Verret, who is the school nurse, phones Plaintiffs to invite them to meet with Defendant Kelly to "discuss" the matter of special education for their daughter. Plaintiffs arrive at the Cottage Street School and are ushered in a room where a team of six "professionals" sitting around a table, are in deep consultation with one another.

15

55. These "professionals" included Defendants Bernheimer and Alberton, school psychologists; Edna O'Brien, Director of Special Education; Eileen Ford, Samantha's classroom teacher; Defendant Verret, the school nurse; and, Defendant Kelly, the school principal.

56. With Defendant Kelly and Eileen Ford forming a silent Greek chorus, no discussion of special education is allowed. The other "professionals" alternately cajole, harass and attempt to intimidate Plaintiffs into signing a consent form for special education. Defendant Bernheimer at the end of this two-hour ordeal requests permission to "speak" with Samantha's team of physicians.

57. Plaintiffs decline this request, pointing out that they have already signed several authorizations for written summaries of treatment and not one of their daughter's four physicians has been asked for any written summary. Plaintiffs insist that to protect their daughter's medical privacy, school officials would have to content themselves with written summaries, particularly since their obligation was to educate Samantha not diagnose her medical problems.

58. A few days after this meeting, on or about June 3, 2001, Defendants Verret, Kelly and Alberton recklessly and without Plaintiffs' knowledge or consent, invade Samantha's medical privacy by phoning her psychiatrist and coercing him into disclosing privileged information and into reversing his authorization for home tutoring. Plaintiffs are never given notice of this "interview" by school or physician.

59. Meanwhile, Plaintiffs, in the dark as to the above-described malfeasance, send a letter to Defendant Kelly, never acknowledged, pointing out the inadequate

amount and subject matter of the instruction given by Defendant Kyed and request more time be allowed, possibly extending the school year to address subjects that have not been taught, viz. grammar, reading, spelling, science, etc.

60. Coterminous with Defendant Kelly's receipt of this letter, Defendant Kyed, who had not yet displayed her conspiratorial bona fides, discloses to Plaintiffs on or about June 6, 2001, that the school personnel are in an "uproar" over Plaintiffs' letter with Defendant Kelly declaring she has no intention of providing more than a de minimis educational benefit to Samantha.

61. Defendant Kelly's rationale for this failure to abide by her statutory duty was quoted verbatim by Defendant Kyed, viz, "If I agree to her parent's demands, every other parent in Samantha's class will be lining up for the same treatment." Defendant Kyed, when asked by Plaintiffs what she thought the school would do, replied, "Robert Doyle is planning to take you to Court."

62. Defendant Kyed offers to write up and does write up a report of her activities tutoring Samantha in arithmetic and history and tells Plaintiffs that this effort was given a hostile reception by Defendant Kelly who told her not to expect to be employed tutoring Samantha beyond the close of the school year.

63. Plaintiffs, unaware of Defendant Kyed's proclivities for double-dealing, hire her privately to continue tutoring Samantha for the entire summer at their expense. They prepare their summerhouse with desks, books, and blackboard for Defendant Kyed's convenience.

64. With the close of the 2000-2001 school year, and having received no report card from Defendant Kelly and no school record as requested in May, Plaintiffs write

another letter to her inquiring about Samantha's educational status on June 18, 2001.

65. On July 28, 2001, a letter dated July 13, 2001 arrives in Plaintiffs' mailbox. It is from Defendant Kelly. This letter, purporting to enclose the "school record" contains several deliberate misrepresentations and the following three documents:

   a) Several scattered pages of testing results from a grade placement examination conducted in the summer of 2000.

   b) A copy of the 2000-2001 academic transcript with nothing whatever written on it for the entire second half of the school year.

   c) A signed, undated, six word order from Plaintiffs' former psychiatrist tersely reversing his order authorizing home tutoring for Samantha.

66. Defendant Kelly, confident with this "coup" that she has derailed Plaintiffs' hopes to continue with home tutoring in the 2001-2002 school year, now not more than three weeks away, advises Plaintiffs to remove their daughter from Public School and "home school" her themselves. She gives Plaintiffs instructions on how to go about it.

67. Defendant Kelly further informs Plaintiffs in her letter that if they do not remove their daughter from public school or, in the alternative, consent to special education, she will assign Samantha to a fourth grade classroom and adds a dire warning that she will surely fail.

68. Plaintiffs, who had already dismissed Dr. Auster, their child's psychiatrist, in June on account of their perception that he was playing games with her medication, and engaged Dr. Tufo, a psychiatrist, in July to replace him, consulted with their pediatrician, Dr. Caine, in early August concerning Dr. Auster's malfeasance since the first time Plaintiffs laid eyes on his second "order" was in Defendant Kelly's envelope.

69. Dr. Caine volunteers to authorize home tutoring himself, telling Plaintiffs he is conscious of the dangers classroom learning presented to Samantha at this stage of her disorder.

70. On August 22, Plaintiffs send their fourth letter to Defendant Kelly containing Dr. Caine's order for home tutoring and the results of their daughter's physical examination. This letter is appended hereto as Exhibit C and incorporated by reference herein.

### SCHEME #2

71. Defendant Kelly's secretary phones Plaintiffs the following day, August 23, and states she has sent their letter on to Defendant Mintzer. She asks Plaintiffs to send her a copy of their original letter. Plaintiffs comply.

72. Opening day of school, August 25, 2001, comes and goes without a tutor being provided or any reply from any Defendant to Plaintiffs' August 22nd letter.

73. On or about September 3rd, Defendant Kyed tells Plaintiffs that she has not been rehired as a teacher's aide. She appears stunned and states that Defendant Kelly must be retaliating for her tutoring Samantha during the summer and for being "nice" to Plaintiffs.

74. Plaintiffs inform Defendant Kyed that they will file a formal complaint with the Massachusetts Department of Education about the egregious lack of instruction and offer to employ her to continue to tutor Samantha until the matter is resolved. Defendant Kyed agrees and informs Plaintiffs that although she knows little of the 4th grade curriculum she believes it will take at least 4-5 hours a day to cover all aspects of it.

75. The next day Plaintiffs send their fifth letter never acknowledged to Defendant Kelly, informing her of their intention to file a complaint with the Massachusetts Department of Education. Plaintiffs phone the Massachusetts Department of Education intake officer to orally complain about the non-existent instruction.

76. On September 11, 2001, at 3:45 P.M., Defendant Kyed arrives at Plaintiffs' home and tells them that she had been unexpectedly "rehired" the previous Sunday to be a teaching aide to a Cottage School fourth grade student for six hours per day and had also been instructed to tutor Samantha for one hour per day, four days per week well after the close of the regular school day.

77. On September 12, 2001, Plaintiffs mail a formal complaint to the Massachusetts Department of Education alleging insufficient and untimely instruction. This complaint is attached hereto as Exhibit D and incorporated by reference herein.

78. On September 13, 2001, Defendant Kyed specifically requests that Plaintiffs allow her to continue teaching in the summerhouse while the weather remains mild because it was "so lovely".

79. On or about September 19, 2001 Plaintiffs receive a call from their pediatrician concerning a letter he received from Defendants Loud and Bernheimer. The letter

deliberately infers Samantha is a special education student who is being harmed by home tutoring, misrepresents the intent of Massachusetts educational law, and contains coercive language implying Dr. Caine will have much to account for if he does not revoke his authorization for home tutoring forthwith. Dr. Caine was also exhorted to telephone Defendants as soon as possible to speak with them about Samantha.

80. Plaintiffs write Defendant Bernheimer to remind her that the Sharon Schools no longer had any permission to communicate with their physicians after the incident with Dr. Auster. This letter is attached hereto as Exhibit E and incorporated by reference herein.

81. Defendant Bernheimer declines to acknowledge or to reply to Plaintiffs' letter. Instead, on or about October 10, 2001, Plaintiffs receive a phone call from Defendant Loud who has replaced the retiring Defendant Doyle as Sharon Director of Pupil Personnel. Defendant Loud invites Plaintiffs to meet with her concerning their "unfortunate" complaint to Massachusetts Department of Education.

82. Plaintiffs meet with Defendants Loud, Bernheimer and Kelly in Kelly's office at the Cottage Street School. At this meeting:

    a) Defendant Loud expresses her deep concern that parent's complaints have not been addressed and urges them to attend "child study" meetings she plans to set up with Defendant Kelly to assure that Samantha's education progress is properly managed.

b) Defendant Bernheimer apologizes for writing the letter to Dr. Caine.

c) Defendant Kelly asserts she has never seen Defendant Kyed's progress report given to her in June.

83. Defendant Loud, on or about October 20, 2001, mails her answer to Plaintiffs' complaint to the Massachusetts Department of Education but omits to send the required copy to Plaintiffs. In early November, Plaintiffs request Massachusetts Department of Education to send them the omitted copy.

84. This purported "answer" contains a staggering number of deliberate misrepresentations and deliberately and falsely portrays Plaintiffs as agreeing to her proposed remedies to correct the matters complained of.
This answer also contains allegations made by Defendant Kyed concerning her tutoring of Plaintiffs' daughter.

a) She complains about the summerhouse where she has been "forced" to teach.

b) She makes dark allusions about Samantha appearing "fearful and clinging".

c) She complains she is isolated without proper parental supervision.

85. Plaintiffs, not grasping as yet the intent behind Defendant Kyed's description of their daughter, confront her only with her complaint about lack of parental supervision. Defendant Kyed appears dumbfounded and apologizes profusely to

Plaintiffs, asserting the following: "They told me what I said would be confidential."

86. A few days later, Samantha confides to Plaintiffs that Defendant Kyed has been angrily interrogating her about her past and threatening her with punishment if she tells any lies. Samantha appears emotionally distraught and begins to cry.

87. Plaintiffs invite Defendant Kyed to continue her instruction in the main house dining room where she will receive the parental supervision she requires.

88. For the next several weeks, Samantha interrupts Defendant Kyed's instruction in the dining room at least once each day and leaves the room in order to hold her mother's hand because Defendant Kyed is staring at her so angrily it makes her anxious.

89. Meanwhile, Plaintiffs receive a November 2001 letter from Defendant Kelly containing the deliberate falsehood that she is "pleased" to see that a new primary tutor, Mrs. Rebello, will begin instruction and she invites Plaintiffs to attend the first "Child Study" meeting on November 20, 2001.

90. Plaintiffs arrive at this meeting to find the following Defendants deep in consultation with one another: Loud, Berheimer, Kelly, Verret, Alberton, and Kyed. Edna Rebello, now Samantha's primary tutor, does not attend and is never present at these "meetings".

91. This "Child Study" meeting begins with Defendant Kyed reading a paragraph commenting on Samantha's lack of progress in arithmetic. While Defendant Kyed consults with Defendant Berheimer, Defendant Loud begins to hector

Plaintiffs about their refusal to consent to special education. Each Defendant, in turn, interrogates Plaintiffs according to an obvious pre-arranged plan, viz.,

    a)     Defendant Verret demands to know what medications Plaintiffs are giving to Samantha.

    b)     Defendant Alberton contemptuously refers to Samantha as "two years behind" her peers.

    c)     Defendant Loud follows up with the assertion that Defendant Mintzer has advised her that she has a legal right to force Plaintiffs to consent to special education.

    d)     Defendant Kelly threatens Plaintiffs with a charge of child abuse if they refuse to consent.

92. Plaintiffs politely point out that lawyer Mintzer is in error and Defendant Loud replies she will certainly consult him about the matter.

SCHEME #3

93. At the December "Child Study" meeting Defendant Loud admits she has no authority to compel Plaintiffs' consent to special education but threatens to file charges of child abuse against them if they refuse to consent.

94. Plaintiffs respond that she files such bogus allegations at her peril, not realizing the danger they were now in.

95. In early January Plaintiffs receive the third special education proposal, replete with deliberate misrepresentations, by mail and refuse to consent by return letter which is attached as Exhibit F hereto and incorporated by reference herein.

96. In January Defendant Kyed steps up her angry assault on Samantha, pointedly staring at her disfigured face while at the same time taking deliberate steps to undermine the level and amount of instruction she gives in her hour of tutoring.

97. Plaintiffs address both the rude behavior and unethical practices of Defendant Kyed in a letter to her and in a letter to Defendant Loud.  These letters are attached hereto as Exhibit G and H respectively and are incorporated by reference herein.

98. In a letter to Plaintiffs, Defendant Kyed answers their objections, denies what she has plainly done and copies her letter to Defendants Loud, Bernheimer, Kelly, Verret, Alberton and Mintzer.

99. In a letter dated February 1, 2002, Defendant Mintzer informs Plaintiffs' attorney of his intentions to file charges of child abuse against Plaintiffs if they refuse to consent to special education, stating, "time is of the essence" and hinting darkly about "red flags".

100. On February 3, 2003, Defendant Loud visits Plaintiffs' home.

    a) She tells Plaintiff Alexander that Attorney Mintzer is forcing her to file charges of child abuse against them.

    b) She states she has never done such a thing in her entire educational career and she doesn't intend to do so now.

    c) She asks Plaintiff Alexander to please remove her daughter from public school and offers to help her get permission to home school Samantha.

  d)  When Plaintiff Alexander refuses, she states: "I'm not

     leaving here without an agreement."

101. During a two-hour conversation Defendant Loud and Plaintiff Alexander negotiate a

  compromise which provides for greatly expanded compensatory tutoring in exchange

  for Plaintiffs' agreement to have their daughter tested for special education needs and

  to pay for it themselves. This compromise written up by Plaintiff Alexander at

  Defendant Loud's request and an affidavit concerning same are attached hereto as

  Exhibits I and J and are incorporated by reference herein.

102. Plaintiffs forthwith obtain a recommendation from their child's psychiatrist, Dr.

  Tufo, for a doctor to perform the testing agreed to as part of their bargain with

  Defendant Loud and set up an appointment with Dr. Malcolm for March 1, 2002.

103. On or about February 28th, Plaintiffs receive a letter purportedly written by

  Defendant Loud on February 13, 2002. In this letter Defendant Loud:

    a)  Summarily repudiates the February 3rd agreement.

    b)  Falsifies the content of that meeting, implying Plaintiff

      Alexander is either incompetent or a liar.

    c)  Threatens to file charges of child abuse against Plaintiffs if

      they refuse to consent to special education testing

      performed only by the school.

FIRST CAUSE OF ACTION

(RICO, 18 U.S.C., 1961 ET SEQ.)

COUNT ONE (18 U.S.C. SECTION 1962 (a))

104. Plaintiffs re-allege and incorporate paragraphs 7-103 and 118-143 by reference as if fully stated herein and further allege:

105. That Defendant Kelly, acting with the necessary mens rea, received tainted de facto income from a pattern of racketeering activity and that this income was invested in the Cottage Street School. Defendant Kelly's actions were the direct and proximate cause of injury to the Plaintiffs because that tainted income was, in fact, the property of the Plaintiffs.

105 a) Pursuant to RICO, 18 U.S.C. section 1964 (c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

COUNT TWO (18 U.S.C. SECTION 1962 (b))

106. Plaintiffs re-allege and incorporate paragraphs 7-105 and 118-143 by reference as if fully stated herein and further allege:

107. That Defendants Kelly, Doyle, and Loud, acting with the necessary mens rea, corrupted their respective offices in the commission of predatory racketeering offenses; that through a pattern of racketeering activity they were enabled to maintain their interest in and/or control of the Cottage Street School, and that this activity was the direct and proximate cause of injury to the Plaintiffs and loss of their property.

107 a) Pursuant to RICO, 18 U.S.C. section 1964 (c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

## COUNT THREE (18 U.S.C. Section 1962 (c))

108.Plaintiffs re-allege and incorporate paragraphs 7-107 and 118-143 by reference as if fully stated herein and further allege:

109.That Defendants Kelly, Doyle, Loud, Berheimer, Alberton, Verret, Kyed and Mintzer, employed by or associated with the Cottage Street School, conducted or participated in the conduct of the Cottage Street School's affairs through a pattern of racketeering activity while acting with the necessary mens rea, and that this activity was the direct and proximate cause of injury to the Plaintiffs and the loss of their property.

*109* a)    Pursuant to RICO, 18 U.S.C. section 1964 (c) Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

## COUNT FOUR (18 U.S.C. SECTION 1962 (d))

110.Plaintiffs re-allege and incorporate paragraphs 7-109 and 118-143 by reference as if fully stated herein and further allege:

111.That Defendants Kelly, Doyle, Loud, Bernheimer, Alberton, Verret, Kyed, Mintzer, Senges, Hawkes-Sullivan, Thomas, Keezell, Cohen, Pontes and Jackson, acting with the necessary mens rea and the required scienter, conspired to violate 18 U.S.C. section 1962 (a), (b) and (c).

112.That the primary wrongdoers, Defendants Kelly, Kyed, Verret, Mintzer, Loud; the co-conspirators, Defendants Bernheimer, Doyle, Alberton, Senges, Hawkes-Sullivan; the aiders and abettors, Defendants Thomas, Keezel, Pontes, Cohen and Jackson,

bound together by a common agreement, mounted their attacks on Plaintiffs according to a settled principle of mutual understanding.

113. That there is a direct, causal link between the predicate acts committed by the above-named Defendants, the conspiracy to commit these acts and a concomitant and quantifiable loss of Plaintiffs' property.

114. Pursuant to RICO, 18 U.S.C. section 1964 (c), Plaintiffs are entitled to recover threefold their damages plus costs and attorneys' fees.

## PRAYER FOR RELIEF

Wherefore Plaintiffs request that Defendants be cited to appear in this action and that after trial by jury, a judgment be entered granting Plaintiffs the following:

    a.  Actual damages according to proof.

    b.  Punitive and treble damages according to proof.

    c.  Mental anguish damages according to proof.

    d.  Pre-judgment and post judgment interest at the legal rate.

    e.  Reasonable attorney fees and costs of Court and

    f.  Such other and further relief, both general and special, at law and in equity, to which Plaintiffs are entitled.

## SECOND CLAIM

## JURISDICTION AND VENUE

115. Plaintiffs re-allege and incorporate by reference herein, paragraphs 4-6.

## PARTIES

116. Plaintiffs re-allege and incorporate by reference herein, paragraphs 7-15.

## STATEMENT OF THE CASE

117. Plaintiffs re-allege and incorporate by reference herein, paragraphs 16-34.

### PLEADINGS

118. Plaintiffs re-allege and incorporate by reference herein, paragraphs 35-103, and further allege the following:

119. That Plaintiffs were seen by Defendants to be members of a limited and specifically definable group, to wit, parents of disabled and therefore costly to educate children, and/or parents accused of child abuse and that the criteria used to define these groups were invidious.

120. That Plaintiffs were treated with contempt engendered by a specific and invidious discriminatory animus on account of their perceived membership in these two groups and that Defendants' conduct put them at risk of serious and immediate harm, a risk which was obvious and well known to each and every Defendant, to wit, imprisonment, possibly for life, and/or loss of custody of their daughter.

121. That Defendants acted recklessly and in conscious disregard of that risk and further, fully aware of the gravity of the imputed crime, intentionally attempted to force Plaintiffs to run the gauntlet of that risk, specifically intending the effects of such a performance, with its anticipated attendant publicity, on other members of either group so situated.

### FACTUAL BASIS FOR CLAIMS

122. On March 1, 2002, Plaintiffs are informed in a phone call by Defendant Senges, a Massachusetts Department of Social Services investigator, that charges of child abuse have been filed against them.

123. Massachusetts Department of Social Services Defendants Senges and Hawkes-Sullivan "screen in" Defendant Kelly's complaints against Plaintiffs.  In response to Plaintiffs' demand, Defendant Senges a few days later reads a list of charges over the phone, to wit:

      a)   Refusal to allow a Special Education evaluation.

      b)   Child is two years behind her chronological peers in school.

      c)   Tutor complains that "parent is present during instruction, limiting discussion about race, homosexual Congressmen, ethnicity, religion and other sexual orientation."

      d)   Child is not allowed to write in cursive.

      e)   Parents refuse to consent to school personnel speaking with physicians.

      f)   Parents have been "physician shopping".

      g)   Parents giving child medication not prescribed by physicians.

      h)   Parents not providing "therapy" for their child's disorder.

124. During this telephone interview, Defendant Senges admits she does not know of the existence of Mrs. Rebello, Samantha's primary tutor, and appears confused when told of it.

125. Notwithstanding a subsequent interview with Mrs. Rebello, who strongly confuted all of the above-listed allegations, Defendants Senges and Hawkes-Sullivan are determined to further the goal of the conspiracy and attempt to squeeze some inculpatory evidence from the stones they have been given.

126. On March 6, 2002, Defendant Senges, on a police mission, crosses Plaintiffs' threshold without a warrant, without Plaintiffs' informed consent and without an exigent circumstance in her possession.

127. While in Plaintiffs' home, she searches for the fruits and instrumentalities of a crime that, unbeknownst to Plaintiffs, Defendant Senges had inferred from a chronology concocted by Defendant Kyed. In her zeal to leave no stone unsqueezed, she seizes Plaintiffs' child without their consent, removes her to her bedroom, shuts the door and interrogates the child for 25 minutes concerning the nature of Defendant Kyed's inferences.

128. The odious and criminal implications of these "inferences" are never voluntarily disclosed to Plaintiffs. Before exiting Plaintiffs' residence, Defendant Senges concedes that she does not believe Defendant Kyed's malicious, self-serving documentation. Her excited and exasperated utterance, delivered during her final moments of interrogation of Plaintiffs, furnishes the necessary clarification of her disbelief, to wit: "Why did you ever let that women into your house!" in reference to Defendant Kyed.

129. Defendant Senges exits Plaintiffs' home with the absolute conviction that there has been no educational, physical or emotional abuse of Samantha and confirms this conviction in a phone call to Plaintiffs on March 9, 2002. She informs them that the educational controversy is "between you and the school".

130. Defendant Hawkes-Sullivan, however, dismayed by the mounting exculpatory evidence, had already deliberately fabricated a "consent" to support charges of

"medical neglect" against Plaintiffs. Defendant Senges warns Plaintiffs to "cooperate" with this verdict or "things will get messy".

131. In April, 2002, Defendant Thomas takes over where Defendants Senges and Hawkes-Sullivan leave off and makes her own contributions to the malicious and retaliatory prosecution of Plaintiffs.

132. Notwithstanding Dr. Tufo's and Dr. Caine's explicit refutation in writing of the charge of medical neglect against Plaintiffs, furnished to Defendant Thomas, she "opens" a case against Plaintiffs. She does this in order to "officially troll" through Plaintiffs' family life and to compel them by her proposed interrogation to incriminate themselves in some way she could then link to Defendant Kyed's slanderous and defamatory comments about them.

133. In retaliation for Plaintiffs' refusal to be thus interrogated, Defendant Thomas causes them to be listed as perpetrators in the Massachusetts Department of Social Services Central Registry and Defendant Keezell concomitantly postpones Plaintiffs' request for a Fair Hearing indefinitely.

134. In June 2001, Defendant Thomas colludes with Defendant Kelly in the preparation of a "service plan" which enlarges, ex post facto, on the original reason of "medical neglect" to incorporate Defendant Kelly's insistence that Plaintiffs consent to special education.

135. When Plaintiffs direct their attorneys to request a conciliatory meeting in July, 2002, with Defendant Pontes, Massachusetts Department of Social Services Area Director, as provided for in Massachusetts Department of Social Services policy and procedure, he does not even have the courtesy to acknowledge it.

33

136. In August 2002, Plaintiffs, having secured new authorizations for home tutoring by both Dr. Tufo and Dr. Malcolm, forward them to Defendant Kelly who declines to acknowledge them.

137. In late August, Plaintiffs write to Defendant Superintendent Jackson to notify her of Defendant Kelly's most recent non-feasance. This letter is attached hereto as Exhibit K and incorporated by reference herein.

138. Defendant Jackson never acknowledges or responds to this letter.

139. In September 2002, Plaintiffs receive a letter from Defendant Cohen, a Massachusetts Department of Social Services employee who has been assigned to their "case". Defendant Cohen offers to substitute her ear for a meeting with Defendant Pontes to "hear" any concerns Plaintiffs might have about the way they have been treated.

140. Plaintiffs enroll their daughter in a Catholic School where she is privately and individually tutored in 5th grade curriculum at their expense.

141. Defendant Cohen writes to Plaintiffs' attorney in February 2003, offering to "close" the case against Plaintiffs.

142. Defendant Cohen notifies Plaintiffs' attorney in March 2003 that the case has been "closed" without Plaintiffs ever being told why it was opened.

143. In December, 2004, Plaintiffs receive a second letter from Massachusetts Department of Social Services Defendant Keezell, 940 days after they received his first, informing them that their request for a Fair Hearing will be invalid if they do not phone him by October 8, 2004.

## FIRST CAUSE OF ACTION (1983)

### COUNT ONE

144.Plaintiffs re-allege and incorporate by reference herein paragraphs 7-143 and further

allege:

145.That Defendant Massachusetts Department of Social Services Supervisor Hawkes-

Sullivan violated Plaintiffs' 5th and 14th Amendment rights when, on February 28,

2002, she received and "screened in" Defendant Kelly's allegations without

reasonable or probable cause to believe that the actions complained of actually

occurred or that the actions complained of and listed in paragraph 119 were within the

limited purview of the public agency that employed her.

146.That, upon information and belief, this was not the first time Defendant Hawkes-

Sullivan, acting under color and pretense of law and within the course of her

employment, had colluded with personnel from the Sharon Public Schools to deprive

parents of their civil rights in an arbitrary, capricious, unlawful and malicious act of

bad faith. (Commencing a criminal investigation without probable cause violates the

14th Amendment.)

### COUNT TWO

147.Plaintiffs re-allege and incorporate by reference herein paragraphs 7-146 and further

allege:

148.That Defendant Senges violated Plaintiffs' 5th and 6th Amendment rights when she

mailed on February 28, 2002, an official document purporting to notify Plaintiffs of

the charges against them that contained exactly 8 handwritten words, to wit: "Alleges

neglect of Samantha by mother and father."

149. That this document, attached hereto as Exhibit L and incorporated by reference herein, was the only written notice of the criminal charges against them received by Plaintiffs. (Accusing a person of a crime without probable or reasonable cause violates the 5th Amendment.) (Failing to provide Plaintiffs with a written statement detailing with specificity and sufficient facts the offense charged violates the 6th Amendment.)

### COUNT THREE

150. Plaintiffs re-allege and incorporate herein paragraphs 7-149 and further allege:

151. That Defendant Senges violated Plaintiffs' 4th Amendment rights when, on March 2002, she crossed Plaintiffs' threshold without a warrant and without Plaintiffs' informed consent to conduct a police interrogation concerning the commission of an alleged crime and to search for evidence of that crime. (Entering a person's home to conduct a criminal interrogation except on probable cause supported by oath or affirmation before an impartial magistrate violates the 4th Amendment.)

### COUNT FOUR

152. Plaintiffs re-allege and incorporate herein paragraphs 7-151 and further allege:

153. That Defendant Senges violated Plaintiffs' 4th Amendment rights when on March 2002, she seized Plaintiffs' 11 year old child without their consent, removed child to her bedroom, closed the door and interrogated her for 25 minutes on the subject of a crime the Plaintiffs had never been informed about. (Seizing and interrogating a child without parental consent except on probable cause supported by oath or affirmation before an impartial magistrate violates the 4th Amendment.)

## COUNT FIVE

154. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-153 and further allege:

155. That Defendant Senges violated Plaintiffs' 5th and 9th Amendment rights on March 2002, when she:

> a) Attempted to compel both the Plaintiffs and their minor child to disclose, during her unlawful interrogation, inculpatory information regarding the crime she suspected might have been committed.
>
> b) Attempted to coerce Plaintiffs into revealing the nature of their past expressions, thoughts, associations and beliefs under the implied threat of having their child forcibly removed from their home. (Compulsion is the touchstone of the 5th Amendment)

## COUNT SIX

156. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-155 and further allege:

157. That Defendant Senges violated Plaintiffs' 9th Amendment rights when, during the hereinabove mentioned illegal interrogations, she invaded their privacy and disrupted their family relationships by maliciously humiliating Plaintiffs in front of their 10 year old daughter with accusations of incompetent parenting and by undermining Plaintiffs' child's respect and love for her parents by intentionally implying through her questions that there was something wrong with her parents. (All rights to privacy

and personal information not protected under any specific amendment are protected under the 9th Amendment.)

## COUNT SEVEN

158. Plaintiffs re-allege and incorporate herein paragraphs 7-157 and further allege

159. That Defendant Hawkes-Sullivan violated Plaintiffs 5th and 14th Amendment rights when on March 8 , 2002 she fabricated false statements attributed to Dr. Tufo and used this fabrication to justify her finding Plaintiffs guilty of the crime of medical neglect. (To adjudicate the guilt of any citizen charged with a criminal offense in the absence of an impartial tribunal violates the 5th and 14th Amendments.)

## COUNT EIGHT

160. Plaintiffs re-allege and incorporate herein paragraphs 7-159 and further allege:

161. That Defendant Keezell violated Plaintiffs' 5th and 14th Amendment rights when his letters of March 2002, and October 2004, indefinitely postponed and cancelled Plaintiffs' right to a Fair Hearing, thus ensuring that the malicious actions of Defendants Senges and Hawkes-Sullivan constituted the only timely tribunal Plaintiffs would have in this matter. Defendant Keezell's letters of 3/02 and 10/04 to Plaintiffs are attached hereto as Exhibits M and N and are incorporated by reference herein. (Not to provide procedural redress of actions performed against a citizen by a public agency run constitutionally amok violates the 5th and 14th Amendments.)

## COUNT NINE

162. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-161 and further allege:

163. That Defendant Thomas violated Plaintiffs 3rd and 14th Amendment rights when she listed them as "perpetrators" in the Massachusetts Department of Social Services Central Registry with malicious intent to punish them for refusing to be interrogated or "serviced".

(Defendant Thomas is manifestly not a court of competent jurisdiction with authority to sentence anyone and to sentence a person without a trial, for a crime he is never duly convicted of, violates the 3rd and 14th Amendments.)

## COUNT TEN

164. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-163 and further allege:

165. Defendant Thomas further violated Plaintiffs' 14th Amendment rights when she maliciously attempted to punish Plaintiffs by creation of a service plan she had every intention of compelling Plaintiffs to swallow. This document written on forms provided to her by her employer was intended to strip Plaintiffs of their elementary rights to fair treatment, equal respect and their even more elemental right to privacy. (Any attempt to punish a person for a crime that is not done by a Court with authority to act violates the 14th Amendment.)

## COUNT ELEVEN

166. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-165 and further allege:

167. That Defendant Pontes violated Plaintiffs 5th and 14th Amendment rights when he presided over the foregoing constitutional indignities and, as the crowning insult,

39

refused to even acknowledge Plaintiffs' legitimate request for a conciliatory hearing

which is mandated by his own policy and procedures, thereby foreclosing the only

forum left for Plaintiffs to defend themselves. (Failure to provide any procedural

redress for citizens accused of criminal behavior violates the 5th and 14th

Amendments.)

## COUNT TWELVE

168.Plaintiffs re-allege and incorporate herein by reference paragraphs 7-167 and further

allege:

169.That Defendant Cohen violated Plaintiffs 14th Amendment rights when she proposed

to substitute herself for the procedural due process mandated by the Constitution and

purportedly taken into account by her employer with its pretense of either a Fair

Hearing or an administrative one. This offer was made in a letter dated September

2002 and is attached hereto as Exhibit O and incorporated by reference herein.

## COUNT THIRTEEN

170.Plaintiffs re-allege and incorporate by reference herein paragraphs 7-169 and further

allege:

171.That the actions alleged above and detailed in Counts One through Twelve deprived

Plaintiffs of the following rights, privileges and immunities protected by the

Constitution and laws of the United States, namely,

a)  Freedom from capricious, malicious and retaliatory

prosecution.

b)  Freedom from administrative Bills of Attainder.

c)  Freedom from warrantless, consentless searches.

    d)  Freedom from warrantless, consentless seizures.

    e)  Right to be notified in particular written detail concerning the allegations against them.

    f)  Right not to be punished without first being tried, convicted and sentenced by a Court with authority to act.

    g)  Right to equal treatment and equal protection under the law.

    h)  Right to due process to redress procedural and unconstitutional wrongs.

172. Pursuant to 42 U.S.C. section 1988, Plaintiffs are entitled to reasonable attorney's fees.

## SECOND CAUSE OF ACTION (1985)

## COUNT ONE

173. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-172 and further allege:

174. That each of the above named Defendants having reached a common understanding to do that which is unlawful, breached their duty to Plaintiffs and gave substantial assistance and encouragement to the others in accomplishing the wrongful acts detailed hereinabove.

175. That these wrongful acts were committed in furtherance of the goals of the conspiracy, to wit, to deprive Plaintiffs of their liberty and their property and to maliciously prosecute them in retaliation for the expression of their First Amendment Rights.

176. That all Defendants, acting ultra vires and under color of law, engaged in a deliberate scheme to use the justice system in an unconscionable and fraudulent manner; that each Defendant was motivated by subjective malice and ill will; that each committed or consented to the commission of at least one overt, illegal act in furtherance of the conspiratorial scheme.

177. That Defendants Kelly, Doyle, and Mintzer formed the initial conspiracy to harm Plaintiffs; that Defendants Bernheimer, Alberton and Verret climbed on board in May of 2001; that Defendants Loud and Kyed committed themselves in September 2001; that Defendants Senges and Hawkes-Sullivan joined in February 2002; that Defendants Thomas, Keezell, Pontes, Cohen and Jackson aided and abetted the other Defendants in or after April 2002.

## COUNT TWO

178. Plaintiffs re-allege and incorporate herein by reference paragraphs 7-177 and further allege:

179. That in May 2001, Defendants Kelly, Mintzer, Doyle, Bernheimer, Verret, and Alberton violated Plaintiffs 5th and 14th amendment rights to due process and equal protection when they attempted to defraud Plaintiffs of their property and conspired to violate and did violate Plaintiffs' medical privacy, recklessly suborning their physician in early June 2001 in order to further the goals of their conspiracy to Plaintiffs' injury.

## COUNT THREE

180. Plaintiffs re-allege and incorporate herein by reference paragraphs 7-179 and further allege

181. That in October, 2001, Defendants Kelly, Loud, Bernheimer, Mintzer, Kyed, and others, violated Plaintiffs' rights to the due administration of justice, due process and equal protection of the laws when they conspired to, concocted, and did submit to the Massachusetts Department of Education a document containing multiple fraudulent averments and intended to derail the investigation of Plaintiffs' complaint against them, to Plaintiffs' injury.

## COUNT FOUR

182. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-181 and further allege:

183. That in February 2002, Defendants Kelly, Loud, Mintzer, Bernheimer, Verret, Kyed and Alberton violated Plaintiffs' rights to due process and equal protection by instigating a malicious, retaliatory prosecution against Plaintiffs for their expression of their First Amendment Rights. Defendants deliberately manufactured inculpatory evidence, concealed, distorted and suppressed all exculpatory material and information in their possession, and submitted the concocted documentation to Defendant Massachusetts Department of Social Services employees as proof of their charges against Plaintiffs, causing irreparable harm to Plaintiffs and the loss of their property.

## COUNT FIVE

184. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-183 and further allege:

185. That on or about February 28, 2002, Defendants Senges and Hawkes-Sullivan reached a meeting of the minds with the Defendant school employees and did adopt,

as their own, the goals of the conspiracy and did commit overt acts in furtherance of it, to wit, to prosecute Plaintiffs in retaliation for the expression of their First Amendment Rights.

  a) They consulted with "Donna" and "Doreen" to fully flesh out and adopt the patently incredible allegations against Plaintiffs.

  b) They "screened in" the report of Defendant Kelly that Defendant Senges admitted she knew was bogus.

  c) They conspired not to disclose and did not disclose to Plaintiffs the criminal inferences contained in the concocted allegations against them.

  d) They persisted in their unlawful investigation of Plaintiffs even when they knew each allegation had been forcefully refuted by impartial witnesses and by documentary evidence, thereby causing a willful and malicious deprivation of Plaintiffs' rights to due process and equal protection, irreparable harm to Plaintiffs and loss of their property.

## COUNT SIX

186. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-185 and further allege:

187. That Defendant school employees conspired inter alia and with Defendant DSS employees to deprive Plaintiffs of the following rights, privileges and immunities protected by the United States as listed below:

  a) Freedom from capricious, malicious and retaliatory prosecution.

  b) Freedom from Administrative Bills of Attainder.

c) Freedom from warrantless, consentless searches.

d) Freedom from warrantless consentless seizures.

e) Right to be notified in particular written detail of the allegations against them.

f) Right not to be punished without a trial, conviction and sentencing by a Court with authority to act.

g) Right to equal Protection and Equal Treatment under the law.

h) Right to Due Process to redress procedural and unconstitutional wrongs.

188. Pursuant to 42 U.S.C. section 1988 Plaintiffs are entitled to reasonable attorneys' fees.

### THIRD CAUSE OF ACTION (1986)

### COUNT ONE

189. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-188 and further allege:

190. That Defendants Jackson and Pontes authorized, ratified, and condoned the misconduct of their respective Defendant Employees by:

a) Failing to properly discipline, restrict, and control the Defendant subordinates known to be irresponsible in their dealings with the residents of Sharon and the citizens of Massachusetts.

b) Failing to take adequate precautions in the hiring, promotion and retention of personnel.

c) Failing to establish and/or assure the functioning of a meaningful system of oversight of subordinates and to assure proper

procedural remedies for citizens who have been victimized by them.

### COUNT TWO

191. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-191 and further allege:

192. That during the relevant times herein, Defendant Jackson, being the Superintendent of the Sharon Public Schools, and Defendant Pontes, being the Area Director of the Arlington Office of the Department of Social Services, engaged in a systematic misadministration of the laws governing the conduct of their respective agencies.

193. That Defendants Jackson and Pontes, having knowledge of the constitutional wrongs conspired to be done as alleged in paragraphs 174-187 of this Complaint, were about to be done as alleged in Paragraphs 141-169 and 174-185 and having power to prevent by reasonable diligence, or to aid in preventing, the commission of same, neglected or refused to do so.

194. That Defendant Pontes by his refusal to allow "post support" fora of any kind in which Plaintiffs could defend themselves, effectively aided and abetted the malicious, conspiratorial conduct of his subordinates and acted in an improper manner to conceal that misconduct from proper redress.

195. As a direct and proximate result of this conspiracy, trespass, administrative arrest, indictment, conviction and punishment, Plaintiffs have suffered all of the indicia of an Administrative Bill of Attainder forbidden by the 4th Amendment and were further subjected to deprivations of their rights, privileges and immunities secured by the Constitution and laws of the United States.

196. As a direct and proximate result of the misconduct herein described, Plaintiffs experienced and continue to suffer from great mental distress intentionally inflicted; humiliation; embarrassment; outrage; fear; diminution of their enjoyment of life, liberty and property; and, the theft of their property in an amount in excess of $75,000.00. They have also incurred legal fees in connection with their defense of the manufactured allegations against them.

197. Pursuant to 42 U.S.C. section 1988 Plaintiffs are entitled to reasonable attorneys' fees.

## PRAYER FOR RELIEF

Wherefore Plaintiffs request that Defendants be cited to appear in this action and that after trial by jury, a judgment be entered granting Plaintiffs the following:

a. Actual damages according to proof.

b. Punitive damages according to proof.

c. Mental anguish damages.

d. Pre-judgment and post-judgment interest at the legal rate.

e. Reasonable attorney fees and costs of Court, and

f. Such other and further relief both general and special, at law and in equity to which Plaintiffs are entitled.

## THIRD CLAIM

## JURISDICTION AND VENUE

198. Plaintiffs re-allege and incorporate by reference herein, paragraphs 4-6.

PARTIES

199. Plaintiffs re-allege and incorporate by reference herein, paragraphs 7-15.

STATEMENT OF THE CASE

200. Plaintiffs re-allege and incorporate by reference herein, paragraphs 16-34.

PLEADINGS

201. Plaintiffs re-allege and incorporate by reference herein, paragraphs 35-103 and

paragraphs 118-143.

FIRST CAUSE OF ACTION

(Intentional Infliction of Emotional Distress)

COUNT ONE

202. Plaintiffs re-allege and incorporate herein by reference, paragraphs 7-201 and further

allege:

203. That at all times material herein the conduct of all Defendants and especially the

conduct of Defendants Kelly, Kyed, Verret, Mintzer, Senges and Hawkes-Sullivan

was odious, perverse and outrageous. These outrageous acts and omissions were so

malicious and unjust in character and so extreme in degree as to go beyond all

possible bounds of decency and to be regarded as atrocious and utterly intolerable in a

civilized society.

204. As a result of Defendants' acts and omissions, as detailed hereinabove, Plaintiffs

suffered intense humiliation, outrage, pain and suffering amounting to extreme

emotional distress.

## SECOND CAUSE OF ACTION

### (Defamation)

### COUNT ONE

205. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-204 and further

allege:

206. That on several occasions Defendant Kyed, pursuant to a conspiracy to blacken

Plaintiffs' good name, to deprive them of their daughter and possibly, if all went well,

their liberty, maliciously and willfully defamed them with statements she knew to be

false. These statements were made with the deliberate intent and certain knowledge

that they would be acted upon by investigators to the injury and peril of Plaintiffs.

### COUNT TWO

207. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-206 and

further allege:

208. That Defendant Verret maliciously and willfully defamed Plaintiffs, smearing them

and blackening their good name, bringing opprobrium upon them and putting them

deliberately in danger of losing their child and possibly their liberty. Defendant

Verret's statements were false and were known by her to be false and were made with

the intent and certain knowledge that investigators would act upon them to Plaintiffs'

injury and to their peril.

### COUNT THREE

209. Plaintiffs re-allege and incorporate by reference herein, paragraphs 7-208 and further

allege:

210. That Defendant Kelly maliciously and willfully defamed Plaintiffs, smearing them and blackening their good name, bringing opprobrium upon them and putting them deliberately in danger of losing their child and possibly their liberty. Defendant Kelly's statements were false and were known by her to be false because she had invented them. They were unjust and the fruit of a conspiracy to ruin Plaintiffs beyond repair. It was Defendant Kelly's specific intent that Plaintiffs' child be seized from their home and that Plaintiffs be so distracted by the attacks upon their character (and hopefully their liberty) that Defendant Kelly could continue to appropriate their property for her own.

### COUNT FOUR

211. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-210 and further allege:

212. That between March 1, 2001 and March 10, 2003 Defendants Kelly, Kyed, and Verrett made, or caused to be made, or did nothing to correct false statements to third parties, false statements of material fact concerning Plaintiffs to the effect that Plaintiffs were rigid, humorless child molesters who had fabricated their daughter's birth certificate, taught her to hate Moslems and homosexual congressmen, and had deliberately prevented her from enjoying a normal social life. These statements were made in order to bring about a malicious prosecution of Plaintiffs in retaliation for their expression of their First Amendment Rights.

213. That Defendants Kelly, Kyed and Verrett made or caused to be made the above-referenced false statements intentionally, knowingly and with reckless and malicious

disregard of the falsity of such statements and of the resulting harm and peril to Plaintiffs.

214. That the above-referenced statements made by Defendants concerning Plaintiffs were false and defamatory in nature and were intended to hold and did hold Plaintiffs up to public contempt and ridicule, all to Plaintiffs' damage.

THIRD CAUSE OF ACTION

(Educational Malpractice)

COUNT ONE

215. Plaintiffs re-allege and incorporate by reference as if fully stated herein paragraphs 7-214, and further allege:

216. That Defendants Kelly, Mintzer, Loud, Doyle, Bernheimer and Kyed at different times from March 2001 to September 2002 and in various configurations entered into agreements and reached mutual understandings whereby they would deliberately and maliciously deprive Plaintiffs' 10 year old daughter of her educational rights and benefits under state and federal education law.

217. That the above-named Defendants accomplished this goal and did successfully derail Plaintiffs' daughter from obtaining a fair and sound education during the relevant time herein described by:

    a) Failing deliberately and with malice to organize, manage and evaluate her education program as required by Massachusetts's law.

    b) Failing deliberately and with malice to conform to even minimal statutory requirements concerning the quantity, quality and content of the instruction provided to Samantha from 3/1/01 to 9/1/02.

c) Deliberately and maliciously undermining the quantity and quality of the de minimis instruction actually given Samantha from 3/1/01 to 9/1/02.

d) Repeatedly and deliberately refusing to provide Plaintiffs with their daughter's school record for over four years to the present and counting.

e) Deliberately and maliciously seeking to detain, harass, intimidate, coerce, embarrass, annoy, abuse and otherwise distract Plaintiffs in order to interfere with or eliminate their ability to advocate for their daughter's educational prerogatives.

FOURTH CAUSE OF ACTION

(Declaratory and Injunctive Relief)

COUNT ONE

218. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-217 and further allege:

219. That the statutes 51/A and 51/B of the Massachusetts General Laws, on their face and as applied to Plaintiffs, violate the Due Process and Equal Protection Clauses of the 5th and 14th Amendments in the following particulars:

a) They are so vague, overbroad and indefinite that persons of common intelligence must guess as to their meaning and differ as to their application.

b) They allow for the inference of an irrational presumption of guilt in a manner which contradicts the

52

State's primary obligation to establish proof beyond a reasonable doubt.

c) They are not drawn with sufficient clarity to inform anyone of the actual conduct sanctioned.

d) They do not possess the degree of certainty required for a criminal law to pass constitutional muster in that it forces an individual to speculate at peril of losing his children or his liberty whether or not his conduct is prohibited.

e) They constitute, in fact, a legislative scheme that, as fleshed out by the policies and procedures of their creature agency, the Massachusetts Department of Social Services, authorizes manifold constitutional depravities including, but not limited to, the unfettered use of the general warrant on the flimsiest of pretexts.

f) They delegate basic questions of guilt or innocence to bureaucrats for resolution on an ad hoc basis with the attendant certainties of arbitrary and discriminatory application.

g) They provide no acceptable or ascertainable standards for a trier of fact to determine guilt or for the imposition of criminal sanctions should their victim actually have

53

been fortunate enough to be granted a bona fide trial in
a competent Court with authority to act.

## COUNT TWO

220. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-219 and further
allege:

221. That the official policies and procedures of the Massachusetts Department of Social
Services on their face, and as applied to Plaintiffs, are a menace to society and, when
employed against citizens, constitute an administrative Bill of Attainder in the
following particulars:

    a)    They authorize the infliction of punishment against "reported" persons
without a judicial trial and all of the attendant constitutional
protections of a judicial trial.

        1. Their victim is publicly named.

        2. A recitation of their victim's activities deemed
reprehensible is publicly made.

        3. Their victim's guilt is publicly declared.

        4. Judgment and verdict are summarily imposed.

        5. Punishment, either absolute or conditional, is prescribed.

222. That the indiscriminate sweep of Massachusetts Department of Social Services
mandate is constitutionally intolerable and that this agency, engaged in the often
competitive business of ferreting out purported crime, has established official policies
and procedures for its employees that do not conform to even minimal constitutional
standards in the following particulars:

54

a) They authorize employees to act on information clearly deficient to meet even the constitutionally vacuous threshold of the above referenced statutes.

b) They authorize employees to initiate quasi-police investigations to search for the fruits and instrumentalities of a crime they do not have to believe had actually been committed.

c) They authorize employees to conduct warrantless and consentless searches and seizures resulting in the compulsory production of information from their victims designed to establish a criminal charge against them without any of the procedural safeguards imposed on all other law enforcement agencies.

d) They do not provide for the victim to receive at any stage of their preposterous proceedings a written notice specifying, with particularized facts, the nature of the offense charged.

e) They authorize employees, who cannot establish guilt by evidence freely and independently secured, to resort to fraud, manipulation and other exercises of bureaucratic power, setting in motion a series of "official" actions designed to harass and coerce their victims into compliance.

f) They authorize these same employees to perform the constitutionally incompatible functions of prosecutor, trier of fact, sentencing judge, appeals court and prison warden.

g) They authorize employees to provide or to suspend, as the exigencies of their cases demand, certain "remedies" for redressing the above-referenced constitutional indignities, (should their victim regain his balance long enough to recognize them) that are grossly inadequate in form and substance. These "remedies" are, in fact, merely bogus window dressing designed to decorate or to obscure the conduct of an agency whose illegitimate reach dwarfs its arguably permissible activities. A "Fair Hearing" postponed for more than 940 days is not a remedy in any sense of the word for its administratively and constitutionally deranged behavior.

COUNT THREE

223. Plaintiffs re-allege and incorporate by reference herein paragraphs 7-222 and further allege:

224. That Department of Social Services Defendants according to the custom and institutionalized practices of their employer agency:

a) Acted on information clearly deficient to meet event the unconstitutionally vacuous threshold of the criminal statutes 51/A and 51/B.

b) Conducted a warrantless and consentless search for the fruits and instrumentalities of a crime they never had any reasonable cause to believe had been committed, a crime that, if convicted of it, Plaintiffs could face life imprisonment.

c) Violated every principle of both liberty and justice to say nothing of common decency by their custodial interrogations of Plaintiffs and their child.

d) Punished Plaintiffs by listing them as "perpetrators" in their "Central Registry", clearly violating Plaintiffs' constitutional rights, viz.,

      1) The right to be given detailed written notice of the allegations or charges against them.

      2) The right not to be punished until tried, convicted and sentenced by a Court with authority to act.

e) Attempted to coerce and intentionally deceive and did coerce and deceive Plaintiffs in April 2002 by describing Massachusetts Department of Social Services "post support" visits to Plaintiffs' home as "conversations" when they were intended to be and were, in fact, adversarial proceedings of a quasi-criminal investigation.

f) Deep-sixed Plaintiffs' March 2002 request for a "Fair Hearing" using the bogus rationale that the agency was understaffed.

g) 940 days later informed Plaintiffs by a letter mailed to the wrong address that their "Fair Hearing" would be denied if they did not phone Defendant Keezell within 8 days.

## FIFTH CAUSE OF ACTION

### (Pendant Jurisdiction)

### COUNT ONE

225. Plaintiffs re-allege and incorporate by reference, as if stated herein, paragraphs 7-224 and further allege:

226. That the acts and conduct hereinbefore alleged constitute warrantless search, malicious prosecution of unconstitutional statutes, abuse of process, prima facie tort, conspiracy tort, educational malpractice, vendetta, defamation of character, intentional infliction of emotional distress, negligence and gross negligence under the laws of the Commonwealth of Massachusetts. This Court has pendant jurisdiction to hear and adjudicate these claims.

### · PRAYER· FOR DECLARATORY RELIEF

Wherefore, Plaintiffs pray this Court to declare statutes 51/A and 51B of the Massachusetts General Laws and.the relevant policies and procedures of its creature agency, The Massachusetts Department of Social Services, in their current form and operation, unconstitutional and enjoined.

### PRAYER FOR RELIEF

Wherefore Plaintiffs demand the following jointly and severally against all Defendants cited to appear in this action, after a trial by jury:

        a)   Actual damages according to proof.

        b)   Punitive damages according to proof.

        c)   Mental anguish damages according to proof.

        d)   Prejudgment and post-judgment interest at the legal rate.

e) Reasonable attorney's fees and costs of court, and

f) Such other and further relief, both general and specific, at law and in equity, to which Plaintiffs are entitled.

R.S.

Peter Tinkham
Juliet Alexander
Samantha Tinkham
March 7, 2005

APPENDIX A

PREDICATE ACTS OF CONSPIRACY ENUMERATED

SCHEME #1, CONSENT BY DECEIT

(As detailed in paragraph 38 of the Complaint)

I.     Upon information and belief, Defendants Kelly, Verret and others meet on or
about 3/12/01 to conspire and plan the implementation of Scheme #1, viz.,
"consent by deceit".

Pursuant to plan:

   a) Defendant Kelly's 3/13/01 letter to Plaintiffs, intended to dupe
      them into signing unnecessary medical releases, is copied to
      Defendants Doyle, Bernheimer, and Alberton.

   b) Defendant Kelly's undated letter to Plaintiffs intended to
      intimidate them into signing additional medical releases and
      allowing a home tutor immediately, is copied to Defendants
      Doyle, Bernheimer, and Alberton.

II.    Upon information and belief, Defendants Kelly, Alberton, Verret, Mintzer and
others meet on or about 4/4/01 and conspire and plan to correct the unforeseen
deficiencies in Plan I.

Pursuant to plan:

   a) A tutor is not provided.

   b) Defendant Alberton mails an unsolicited Special Education
      Proposal dated 4/04/01 to pressure Plaintiffs into consenting to
      special education.

   c) Defendant Kelly declines to return Plaintiffs' phone calls or to
      respond to their letters.

d) Defendant Verret misleads Plaintiffs for six weeks on the matter of providing a tutor until the 30-day deadline for Plaintiffs' consent has passed, viz., 5/01/01.

III. Upon information and belief, Defendants Kelly, Verret, Mintzer, Bernheimer, Alberton and others meet on or about 4/31/01 to conspire and plan for further actions to effect Scheme #1.

Pursuant to plan:

a) A tutor is provided on 5/3/01 without any official notice to Plaintiffs and arrives at 7:20 A.M.

b) Plaintiffs and tutor are kept in the dark for the duration of the spring term as to content, duration and evaluation of instruction to be given which is limited to 3½ hours per week.

c) Defendant Mintzer purports to answer Plaintiffs 3/25/01 and 5/07/01 letters to Defendant Kelly in his letter, dated 5/17/01, intended to intimidate Plaintiffs into consenting to special education and copied to Defendants Doyle and Bernheimer.

d) Defendant Verret telephones Plaintiffs on or about 5/23/01 intending to deceive them into attending a meeting on 5/25/01 ostensibly with Defendant Kelly to discuss special education.

IV. Upon information and belief, Defendants Kelly, Bernheimer, Verret, Alberton and others meet on or about 5/24/01 to conspire and plan how to implement Scheme #1 at the 5/25/01 meeting with Plaintiffs.

Pursuant to    plan:

a) Defendants Berheimer, Kelly, Alberton, Verret and a Mrs. O'Brien and a Mrs. Bishop, on or about 5/25/01, hector, harass,

2

c) Defendant Kyed tells Plaintiffs on or about 6/6/01, viz.; "Robert Doyle is going to take you to Court!"

d) Defendant Kelly's letter dated 7/12/01 but not delivered until 7/28/01 to Plaintiffs is intended to either coerce them into consenting to special education or removing their daughter from Sharon Public Schools. This letter, purporting to contain the school record, contains instead a blank transcript and Dr. Auster's illicitly obtained medical order revoking the home tutor and recommending special education and is copied to Defendants Bernheimer and Alberton.

e) Defendant Kelly then declines to respond to Plaintiffs' phone calls or letters, does not rehire Defendant Kyed for the 2001-2002 school year and does not provide a tutor for the school year beginning on August 25, 2001.

SCHEME #2, CONSENT BY EXTORTION

(As detailed in paragraph 39 of the Complaint)

VI.    Upon information and belief, Defendants Kelly, Loud, Bernheimer, Mintzer, Kyed, Alberton, Verret and others meet on or about 9/7/01 to plan and conspire to implement Scheme #2 in response to Plaintiffs' Complaint to the Massachusetts Department of Education.

Pursuant to plan:

a) Defendant Kelly re-hires Defendant Kyed as a full-time aide and as an after-school tutor to Plaintiffs' daughter.

4

b) Defendant Kyed arrives at 3:45 P.M., on 9/11/01, without any official notice to Plaintiffs. She is to provide 3½ hours of tutoring per week.

c) Defendant Kyed makes a special request to continue tutoring in a converted summerhouse where there will be no parental supervision.

d) Defendants Loud and Bernheimer, without Plaintiffs' knowledge or consent, write a letter dated 9/17/01, to Plaintiffs' pediatrician intended to extort his compliance with Scheme #2 and his abandonment of his medical order for tutoring. This letter is copied to Defendants Kelly and Mintzer and purportedly copied to Plaintiffs but never sent.

e) Defendant Loud arranges for a meeting between Plaintiffs and herself. Defendants Kelly and Bernheimer are present at this meeting intended to restore Plaintiffs' good will towards Defendants after the debacle of 9/17/01.

f) Defendant Loud mails her answer to Plaintiffs' Massachusetts Department of Education complaint in a letter with documents dated 10/28/01, intended to derail the Massachusetts Department of Education's investigation of the complaint and to obstruct the legally mandated provision of compensatory instruction to Plaintiffs' daughter. The required copy is not sent to Plaintiffs by Defendant Loud.

g) Defendant Kyed, as instructed by her co-conspirators, contributes several fabrications to this "answer" including how she is forced

5

to teach in a separate building without parental supervision. Defendant Kyed also lays down a "paper" predicate for her allegations of child abuse against Plaintiffs in this document.

h)   Defendant Kyed angrily interrogates Plaintiffs' daughter, age 11, on or about 11/01/01, about her past and threatens to punish her if she lies.

i)   Defendant Kyed, as instructed by her co-conspirators, begins to undermine the quality and quantity of her already limited instruction.

VII.   Upon information and belief, Defendants Kelly, Kyed, Alberton, Loud, Mintzer, Verret, Bernheimer and others meet on or about 11/14/01 to conspire and plan the implementation of Scheme #2 at the "Child Study" meeting. Pursuant to plan:

a)   Defendants Kelly, Loud, Bernheimer, Kyed, Verret, Alberton and others meet with Plaintiffs on 11/15/01 at the Cottage Street School and according to a pre-arranged game plan attempt, with abusive language, contemptuous language, and threats of charges of child abuse against Plaintiffs, to extort Plaintiffs' consent to special education.

b)   Defendant Kelly mails a letter to Plaintiffs dated 11/19/01 demanding a physical exam be conducted on Plaintiffs' daughter as "required by law", notwithstanding she had, in August 2001, received the results of the 4th grade required physical, certified mail, return-receipt requested. This letter, intended to lay a "paper" predicate for Defendant Kelly's later charges of child

6

abuse against Plaintiffs, was copied to Defendants Loud, Bernheimer, Verret, Alberton and Mintzer and later shown to Department of Social Services Defendants on 2/28/02.

c) Defendants Kelly and Alberton mail an undated letter to Plaintiffs' pediatrician without their knowledge and months after their consent to communicate with any medical person was expressly revoked. This letter intended to coerce Plaintiffs' pediatrician into attending these "Child Study/Parent Harassment" meetings and to solicit a return phone call was copied to Defendants Loud and Bernheimer, purportedly copied to Plaintiffs but never sent.

VIII. Upon information and belief, Defendants Kelly, Loud, Mintzer, Bernheimer, Kyed, Verret, Alberton and others meet on or about 12/19/01 to conspire and plan the further attempts to implement Scheme #2 at the third "Child Study/ Parent Harassment Meeting."

Pursuant to plan:

a) Defendants Loud, Kelly, Bernheimer, Kyed, Verret, Alberton and others gather at the Cottage Street School on 12/20/01 and, according to a prearranged plan, verbally abuse and threaten Plaintiffs with charges of child abuse if they refuse to consent to special education.

IX. Upon information and belief, Defendants Loud, Kelly, Mintzer, Bernheimer, Kyed, Verret, Alberton and others meet on or about 1/03/02 to conspire and plan for the implementation of Scheme #3, while still attempting the furtherance of Scheme #2.

Pursuant to plan:

    a) Defendant Loud mails a third unsolicited Special Education Proposal dated 1/04/02 to Plaintiffs solely in order to lay a "paper" predicate for charges of child abuse against Plaintiffs when the time is ripe;   shown to Department of Social Services Defendants on 2/28/02.

    b) Defendants Kelly, Loud, Bernheimer, Alberton, Verret and Kyed continue their organized efforts on 1/17/02 during a "Child Study" meeting to extort Plaintiffs' consent to special education, continuing to threaten them with charges of child abuse.

    c) Defendant Kyed copies her letters to Plaintiffs to Defendants Loud, Bernheimer, Kelly, Alberton, Verret and Mintzer.

    d) Defendant Mintzer mails a letter dated 2/01/02 to Plaintiffs' attorney threatening to file charges of child abuse against Plaintiffs if they do not consent to special education and copied to Defendants Loud and Bernheimer.

X.    Defendant Loud appears to stray off the reservation when, on 2/03/02 she suddenly invites herself to Plaintiffs' home and, after 2 hours of tough negotiation agrees to a compromise worked out with Plaintiff Alexander and appended hereto as Exhibit I and J.

## SCHEME #3, CONSENT BY MALICIOUS PROSECUTION

### (As detailed in paragraph 40 of this Complaint)

XI.    Upon information and belief, Defendants Loud, Mintzer, Alberton, Kelly and Bernheimer, meet to take into account this unexpected contingency and conspire and plan to implement Scheme #3 forthwith.

8

Pursuant to plan:

    a)  Defendant Loud writes a letter dated 2/13/02 to Plaintiffs, completely repudiating the compromise of 2/03/02; threatening Plaintiffs with child abuse if they refuse to allow special education testing; and in fifty lines of complete fabrications laying down a "paper" predicate to support her charges of child abuse against Plaintiffs on February 28, which is, coincidentally, the day that Plaintiffs receive this letter in the mail.

    b)  Defendant Kyed types up a three page purported chronology of parental neglect and abuse that is breathtaking in the way she includes a fabricated incident to support every indicia of child abuse according to the Department of Social Services manuals.

    c)  Defendant Kelly concocts a report accusing Plaintiffs of physician shopping and refusing to consent to special education.

    d)  Defendant Verret concocts a story that purports to cast doubt upon the validity of Plaintiffs' daughter's birth certificate.

XII.    Upon information and belief, Defendants Kelly, Kyed, Verret, Senges and Hawkes-Sullivan on or about 2/28/02 meet to conspire and plan to flesh out the bogus charges and to carry Scheme #3 to completion.

Pursuant to plan:

    a)  Defendant Senges phones Plaintiffs' physicians to persuade them to favor special education for Plaintiffs' daughter.

    b)  Defendant Hawkes-Sullivan fabricates a "statement" from Plaintiffs' psychiatrist to support charges of "medical neglect" against Plaintiffs.

c)  Defendant Thomas further colludes with Defendant Keezell upon

information and belief on or about 3/19/02 to indefinitely

postpone Plaintiffs' request for a Fair Hearing.

d)  Defendant Thomas supports the bogus charges of medical

neglect and lists Plaintiffs as perpetrators in the Department of

Social Services Central Registry when they refuse to be

"assessed" in April, 2002.

e)  Defendant Thomas colludes with Defendant Kelly on 6/17/02 to

enlarge the charge of "medical neglect" to include a demand for

special education.

f)  Defendant Kelly mails a letter dated 6/17/02 to a non-existent

"Guardian" of Samantha Tinkham, purporting to enclose a copy

of the school end of year report, and copied to Defendants

Thomas, Loud, Bernheimer, Alberton, Verret, and, upon

information and belief, Mintzer; not to Plaintiffs.

g)  Defendant Keezell aids and abets the furtherance of Scheme #3

when he mails a letter dated 9/29/04, mailed to the wrong

address and received by Plaintiffs in December 2004, in which he

finally forecloses Plaintiffs' request for a Fair Hearing, claiming

if he does not hear from Plaintiffs by October 8, 2004, "we will

dismiss your appeal, assuming you are no longer interested in

pursuing this matter". (See Exhibit N)

APPENDIX B

PREDICATE ACTS OF IMPEDING A CRIMINAL

INVESTIGATION ENUMERATED

1. On or about 2/28/02, Defendants Kelly, Verret and Kyed impede with malice the successful completion of a 51/A and 51/B investigation in Plaintiffs' favor by constructing documents that are specifically designed to excite the Department of Social Services employee's animus against charged parents per se.

2. On or about 2/29/02, Defendants Senges and Hawkes-Sullivan impede with malice the successful completion of a 51/A and 51/B investigation in Plaintiffs' favor by expanding, as a result of their animus against charged parents per se, the examination of Plaintiffs' physicians and coercing them to claim that they are in favor of special education for Plaintiffs' daughter.

3. On or about 6/17/02, Defendants Kelly and Thomas impede with malice the successful completion of a 51/A and 51/B investigation in Plaintiffs' favor by colluding together to expand, ex post facto, the charge of "medical neglect" to include an order for special education testing in Plaintiffs' "service plan"

11

## APPENDIX C

## PREDICATE ACTS OF OBSTRUCTION OF JUSTICE ENUMERATED

1. On or about, 10/28/01, Defendants Loud and Kyed conspire together and concoct a false report intended to deliberately derail with malice the investigation by the Massachusetts Department of Education of Plaintiffs' complaint against the Sharon Public Schools.

2. On or about 2/28/02, Defendants Kelly, Kyed, Verret, Senges and Hawkes-Sullivan conspire to obstruct and deliberately, and with malice, obstruct justice by meeting together to plan to carry out together the outrageous farce which constituted Department of Social Services' investigation of charges against Plaintiffs.

3. On or about 3/9/02, Defendant Hawkes-Sullivan obstructs justice when she deliberately, and with malice, fabricates a statement from Plaintiffs' physician to justify her support of charges of medical neglect against Plaintiffs'.

4. On or about 3/1/02, Defendant Keezell deliberately acts to obstruct justice when he indefinitely postpones Plaintiffs' request for a Fair Hearing, citing the bogus rationale that his department is understaffed due to retirements.

5. On or about 4/15/02, Defendant Thomas, upon information and belief, deliberately, and with malice, obstructs justice by listing Plaintiffs as perpetrators in the Department of Social Services Central Registry in retaliation for Plaintiffs' refusal to be "assessed".

6. On or about 5/19/02, Defendants Thomas and Kelly obstruct justice by improperly and with malice enlarging the charge against Plaintiffs, ex post facto, to include failure to consent to special education.

APPENDIX D

PREDICATE ACTS OF EXTORTION AND ATTEMPTED

EXTORTION ENUMERATED

1. On or about 3/22/01, Defendant Kelly attempts to extort Plaintiffs' compliance with Scheme #1 as detailed in paragraph 38 of the Complaint by means of intimidation, deceit and a threat.

2. On or about 5/17/01, Defendant Mintzer attempts to extort Plaintiffs' compliance with Scheme #1 as detailed in paragraph 38 of the Complaint by means of deceit and intimidation.

3. On or about 6/03/01, Defendants Kelly, Verret and Alberton attempt to extort and do extort compliance from Plaintiffs' physician in disclosing privileged medical history of Plaintiff and in abandoning his medical order for home tutoring.

4. On or about 7/28/01, Defendant Kelly attempts to extort Plaintiffs' compliance with her demand that they consent to special education or remove their daughter from Public School by means of a threat and the production of an improperly obtained document from Plaintiffs' physician.

5. On or about 9/17/01, Defendants Loud and Bernheimer attempt to extort Plaintiffs' pediatrician's compliance with their demand that he abandon his medical order for tutoring and/or telephone them to disclose privileged medical history by means of deceit, intimidation and subtle threats.

6. On or about 11/01/02, Defendant Kyed attempts to extort compliance from Plaintiffs' eleven-year-old daughter with her demands that she disclose her past educational experiences by means of threats of punishment if she "tells any lies".

7. On or about 11/15/01, Defendants Kelly, Loud, Bernheimer, Verret and Alberton attempt to extort Plaintiffs' compliance with their demands for privileged medical

13

history and Plaintiffs' consent to special education by means of abusive and contemptuous language, intimidation, and threats.

8.  On or about 12/20/01, Defendants Loud, Kelly, Bernheimer, Verret and Alberton attempt to extort Plaintiffs' compliance with their demands that they consent to special education by means of threats and abusive, contemptuous language.

9.  On or about 2/03/02, Defendant Loud attempts to extort Plaintiff Alexander's compliance with her demands that Plaintiffs' remove their daughter from Sharon Public School by telling her that Defendant Mintzer is going to force her to file charges of child abuse against Plaintiffs.

## APPENDIX E

### PREDICATE ACTS OF MAIL AND WIRE FRAUD ENUMERATED

### SCHEME #1 (DETAILED IN PARAGRAPH 38)

1. Defendant Kelly's letter mailed to Plaintiffs dated 3/13/01.

   CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations of interest in and concern for Plaintiff Samantha Tinkham's educational well-being; Fraudulent reason given for requesting Plaintiffs sign medical release forms.

   MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 23-26,38, and 49-52b. Defendant Kelly anticipated Plaintiffs' reliance on her deliberate, fraudulent misrepresentations and Plaintiffs did rely on same to their injury and loss of their property.

2. Defendant Kelly's letter mailed to Plaintiffs undated but received by Plaintiffs on or about March 22, 2001.

   CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent reason given for demand that Plaintiffs accept the immediate provision of a home tutor; fraudulent reason given for demand that Plaintiffs allow school personnel to "speak" with their physicians.

   MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 23c, 24, 25, 38, and 49-52. Defendant Kelly anticipated Plaintiffs' reliance upon her deliberate, fraudulent misrepresentations and Plaintiffs did rely on same to their injury and loss of their property.

3. Special Education Evaluation mailed to Plaintiffs by Defendant Alberton and dated 4/01/01.

   CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that proposal was developed with "input" from Plaintiffs; fraudulent asseveration of concern for

15

Plaintiff Samantha Tinkham's academic, social and emotional progress by

Defendants.

MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 49-52. Defendant

Alberton anticipated Plaintiffs' reliance upon her deliberate, fraudulent assertions

in this document and Plaintiffs did rely on same to their injury and loss of their

property.

4. Defendant Mintzer's letter mailed to Plaintiffs dated 5/17/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that Plaintiff

Samantha Tinkham's educational future depend on a special education evaluation;

false statement that Plaintiffs' presence during testing would invalidate results.

MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 23c, 24, 25 and

51. Defendant Mintzer anticipated Plaintiffs' reliance upon his deliberate,

fraudulent misrepresentations and Plaintiffs did rely on same to their injury and

loss of their property.

5. Defendants Verrett, Alberton and Kelly letter mailed to Dr. Stephen Auster, M.D.,

dated 6/4/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations of

shared concern for Plaintiff Samantha Tinkham's academic, social and emotional

needs; of their gratitude to Dr. Auster for phoning them; pretense of copying this

letter to Plaintiffs.

MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 56-59 and as a

cover for their improper conduct in the event of any third party scrutiny.

Defendants Verrett, Alberton and Kelly anticipated Dr. Auster's reliance on their

deliberate, fraudulent misrepresentations and Dr. Auster did indeed rely on same

to Plaintiffs' injury and loss of their property.

16

6. Special Education Proposal #2 mailed to Plaintiffs by Defendant Alberton and dated 5/30/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that proposal was developed with "input" from Plaintiffs and fraudulent reiterations of concern for Plaintiff Samantha Tinkham's academic, social and emotional progress.

MOTIVE: Furtherance of Scheme #1 as detailed in paragraphs 23, 24, 25, and 56-59. Defendant Alberton anticipated Plaintiffs' reliance upon the fraudulent misrepresentations contained in this document and Plaintiffs did rely on same to their injury and loss of their property.

7. Defendant Kelly's letter mailed to Plaintiffs dated 7/12/01 but not received by Plaintiffs until 7/28/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False claim to have included the "school record"; fraudulent asseverations of eagerness to find most beneficial placement for Plaintiff Samantha Tinkham; inclusion of illicitly obtained form from Dr. Auster.

MOTIVE: Consolidation of the fruits of Scheme #1 as detailed in paragraphs 49-67. Defendant Kelly anticipated Plaintiffs' reliance upon her deliberate, fraudulent misrepresentations and Plaintiffs did rely on same to their injury and loss of their property.

SCHEME #2 (DETAILED IN PARAGRAPH 39)

8. Defendants Loud and Bernheimer letter mailed to Plaintiffs' physician, Dr. Caine dated 9/13/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations that Dr. Caine has filled out an incomplete order for home tutoring; that he utilized the wrong form; that Plaintiff Samantha Tinkham was a special education student

17

who was being harmed by home tutoring. Falsifying the intent of the Commonwealth; reciting out-of-date education regulations as if they were still in force; improperly encouraging Dr. Caine to contact Defendant Bernheimer; pretense of copying letter, written without the knowledge or consent of Plaintiffs, to Plaintiffs.

MOTIVE: Written inauguration of Scheme #2, in earnest as detailed in paragraphs 39, 68-70, and 79-81 viz., to extort Dr. Caine's compliance with Defendants' desire that he abandon his medical order forthwith. Defendants anticipated Dr. Caine's reliance upon their deliberate and fraudulent misrepresentations. Although Dr. Caine notified Plaintiffs upon receipt of this letter and plainly did not accede to Defendant demands, he nonetheless relied upon the fraudulent contents of this letter during his interrogation by Department of Social Services Defendants on 2/28/02 to Plaintiffs' great injury and loss of their property.

9. Defendant Loud's cover letter and five-page document enclosure mailed to Thomas Taylor, of the Massachusetts Department of Education on October 25, 2001.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that Plaintiffs were satisfied with Sharon's solution to their complaint to the Massachusetts Department of Education; false statement that Defendant Kelly was prepared to convene a monthly "Child Study" team to review Plaintiff Samantha Tinkham's academic progress; false statement that a progress evaluation would be prepared by June 2002; false statement that tutoring will be increased immediately after October 15, 2001; false statement that a copy of Defendant Loud's report had been sent to Plaintiffs.

MOTIVE: Furtherance of Scheme #2 as detailed in paragraphs 81-84 and, particularly, to derail the Massachusetts Department of Education's investigation of Plaintiff complaint against the Sharon Schools.

10. Defendant Kelly's letter mailed to Plaintiffs dated 11/6/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent expression of happiness with additional tutoring time; false statement that she is convening a November "Child Study" meeting to review Plaintiff Samantha Tinkham's progress in academics and on-going educational needs.

MOTIVE: Furtherance of Scheme #2, by continuing to dupe Plaintiffs with a "business as usual" format as detailed in paragraph 89. Defendant Kelly anticipated Plaintiffs' reliance on her deliberate and fraudulent misrepresentations and Plaintiffs did rely on same to their injury and loss of their property.

11. Defendant Kelly's letter to Plaintiffs dated 11/29/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Staged demand for a physical examination report for her files when she was in possession of same, sent certified, by Plaintiffs, return receipt requested and signed, in August, 2001.

MOTIVE: Furtherance of Scheme #2 by making a "paper" record of Plaintiffs' purported medical neglect of their daughter to be shown to the Department of Social Services Defendants when needed. Defendant Kelly anticipated Plaintiffs' reliance on her fraudulent "business as usual" misrepresentations in mailing them this letter and Plaintiffs did rely on same to their great injury and peril and loss of their property.

12. Defendants Kelly and Alberton letter mailed to Plaintiffs' pediatrician Dr. Caine undated, but received by Dr. Caine on or about 12/14/01.

CIRCUMSTANCE OF FRAUD OR MISTAKE:  Improper contact with physician after Plaintiffs refused their consent to any contact without their express permission in each instance; false statement that Child Study meetings were for the purpose of reviewing Plaintiff Samantha Tinkham's academic progress; the fraudulent asseveration that Dr. Caine's participation in such a "review" was critical; pretense at copying this letter to Plaintiffs.

MOTIVE:  Furtherance of Scheme #2 as detailed in paragraph 25 and 39. Defendants anticipated Dr. Caine's reliance upon their deliberate and fraudulent misrepresentations.  Although Dr. Caine plainly did not accede to Defendants entreaties and instead mailed both this letter and his reply to Plaintiffs, he did in fact rely on the fraudulent contents at a later date to Plaintiffs'great injury and peril and the loss of their property.

13.  Defendant Kelly's letter mailed to Plaintiffs dated December 6, 2001.

CURCUMSTANCE OF FRAUD OR MISTAKE:  False characterization of meeting as a "Child Study"; breezy, "business as usual" tone; fraudulent expression of eagerness to work with Plaintiffs.

MOTIVE:  Furtherance of Scheme #2 as detailed in paragraphs 90- 94. Defendant Kelly anticipated Plaintiffs' reliance upon her deliberate and fraudulent misrepresentations and Plaintiffs did rely on same to their very great injury and peril and the loss of their property.

SCHEME #3 (DETAILED IN PARAGRAPH 40)

14. Special Education Proposal #3 mailed to Plaintiffs and dated January 4, 2002 by Defendant Alberton.

CIRCUMSTANCE OF FRAUD OR MISTAKE:  False statement that proposal was developed with "input" from Plaintiffs; fraudulent asseverations that the document

20

is in accordance with Massachusetts Department of Education regulations; false statement that Plaintiffs have "rejected" school's request to communicate with physicians; false statement that Defendants are interested in insuring that tutoring services are "appropriate".

MOTIVE: Inaugural document in Scheme #3 which also furthered the goal of Scheme #2, as detailed in paragraphs 25 and 40. Defendants anticipated Plaintiffs' and Department of Social Services Defendants' reliance on the deliberate and fraudulent misrepresentations and Plaintiffs did rely on same to their great injury, peril and loss of their property.

15.  Defendant Kyed's letter mailed to Plaintiffs dated January 23, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations of fondness for Plaintiff Samantha Tinkham; false statement that Plaintiff Samantha Tinkham had been "open" with Defendant about her disorder; fraudulent asseveration that she does not "recall" discussing Plaintiff Samantha Tinkham's disorder with her.

MOTIVE: Furtherance of Scheme #2 and laying a paper predicate for future investigation of Plaintiffs by Department of Social Services as carried out in Scheme #3 and detailed in Appendix A, Predicate Acts of Conspiracy Enumerated. Defendant anticipated Plaintiffs' reliance upon her deliberate and fraudulent misrepresentations and Plaintiffs did rely on same to their very great injury, peril and loss of property.

16.  Defendant Mintzer' letter mailed to Plaintiffs' attorney dated February 1, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseveration that his client believed Plaintiff Samantha Tinkham "is at risk", that "time was of the essence"; fraudulent statement that "Sharon Public Schools can no longer wait"

21

and that his client believes filing child abuse charges against Plaintiffs is "legally required".

MOTIVE: Express furtherance of Scheme #3 as detailed in paragraphs 25- 32, 40, and 99. Defendant Mintzer anticipated Plaintiffs' attorney's reliance upon his deliberate and fraudulent asseverations. (Plaintiffs' attorney was, upon information and belief, either Defendant Mintzer's student or fellow student at law school and, in any case, apparently a dear friend.) Plaintiffs' attorney did rely upon Defendant Mintzer's deliberate and fraudulent misrepresentations to Plaintiffs' very great injury, peril and loss of their property and their attorney.

17. Defendant Loud's letter mailed to Plaintiffs and dated 2/13/02 but not received by Plaintiffs until 2/28/02, coincidentally the day Defendant Kelly filed charges of child abuse and neglect against Plaintiffs.

CIRCUMSANCE OF FRAUD OR MISTAKE: Fifty lines of complete and utter falsehood and fabrication.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 40, 27- 32, 100 – 103, particularly for the purpose of influencing the Department of Social Services investigators who were shown this document. Defendant Loud anticipated Plaintiffs' and Department of Social Services Defendants' reliance upon her deliberate and fraudulent fabrications and Plaintiffs did indeed rely upon same to their very great injury, peril and loss of their property.

18. Defendant Kelly's letter mailed to Plaintiffs and dated March 1, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations of "eagerness" to work with Plaintiffs one day after she reported them to Department of Social Services as rigid, humorless child molesters.

22

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 27- 32 and to lay

a paper trail to cover her malevolent actions against Plaintiffs. Defendant Kelly

anticipated Plaintiffs' reliance on her deliberate and fraudulent representations of

"business as usual" and Plaintiffs did rely on same to their very grave injury and

peril and loss of property.

19. Defendant Kelly's letter mailed to Plaintiffs and dated 3/12/02.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent statement that

Defendant Kyed was "unable" to continue tutoring; fraudulent statement that

Defendant Kelly was "presently looking for another tutor to take her place".

MOTIVE: Furtherance of Scheme #3 as detailed in paragraph 40 and to lay a

paper trail to cover Defendant Kyed's malicious involvement in falsely accusing

Plaintiffs of child abuse and neglect. Defendant Kelly anticipated Plaintiffs'

reliance upon her deliberate and fraudulent misrepresentations and Plaintiffs did

rely on same to their very great injury, peril and loss of property.

20. Defendant Senges' letter mailed to Plaintiffs and dated February 28, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Purported to notify Plaintiffs of

the criminal charges against them in exactly eight words.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 40, 141-149, 118-

126 and 177. Defendant Senges anticipated Plaintiffs' complete reliance upon the

grotesque content and omission of content and Plaintiffs did rely upon same to

their very great injury and peril and loss of their property.

21. Defendant Senges' letter mailed to Plaintiffs and dated 3/11/02.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that the

"Department has found reasonable cause to support" the allegations of medical

neglect against Plaintiffs.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 40, 30-34, 124-126, 145-146,159-185. Defendant Senges anticipated Plaintiffs' complete reliance upon the false statement in this document and Plaintiffs did rely upon same to their very great injury, peril and loss of their property.

22. Defendant Keezell's letter mailed to Plaintiffs and dated March 19, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: The false statement that early retirement was the reason Plaintiffs could not receive a Fair Hearing from the Department of Social Services.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraph 40, 14, 29-33, 111-113, 161, 177, 222, 224. Defendant Keezell anticipated Plaintiffs' complete reliance upon his false and deliberate statement and Plaintiffs did rely upon same to their very great injury, peril and loss of their property.

23. Defendant Kelly's letter mailed to Edna Rebello and dated June 17, 2002. Mailed by Edna Rebello to Plaintiffs on or about July 20, 2002,

CIRCUMSTANCE OF FRAUD OR MISTAKE: False salutation implying that the document was mailed to "Guardian of Samantha Tinkham", a non-existent person; false statement that the "purpose" of the document is to "inform" the non-existent person about Samantha Tinkham's education status. Document was never mailed to Plaintiffs by Defendant Kelly.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraph 40 and part and parcel of the sub rosa scheme to create a favorable paper trail by not-dating, miss-dating, copying but never sending letters, and, in this case, addressing a document to a non-existent guardian who could be mistaken for Plaintiffs who were never intended to lay eyes on it. Defendant Kelly anticipated the following persons reliance upon the deliberate false statements in this letter, viz., Edna

Rebello, Jennifer Bishop and Department of Social Services Defendant Stephanie Thomas. These persons did indeed rely upon same to the Plaintiffs' injury, peril and loss of their property.

24. Defendant Kelly's letter mailed to Plaintiffs and dated August 22, 2002, but not received until August 31, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statement that she is "reminding" Plaintiffs that Plaintiff Samantha Tinkham's home tutoring ended on June 18, 2002.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 40, 48, 109, 112, and 141-143. Defendant Kelly anticipated that Plaintiffs would rely upon her deliberate and fraudulent cover statement; by the time Plaintiffs received this document, they had formally withdrawn their daughter from Sharon Public Schools.

25. Defendant Cohen's letter mailed to Plaintiffs and dated September 9, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent statement that the meeting with Defendant Pontes "has not yet been scheduled"; fraudulent asseveration that Defendant Cohen wanted to meet Plaintiffs to "discuss any concerns" they may have concerning their treatment by the Department of Social Services.

MOTIVE: Furtherance of Scheme #3 as detailed in paragraphs 40, 169, 177 and 222. Defendant Cohen fully anticipated Plaintiffs' reliance upon her deliberate and false "business as usual" statements. Plaintiffs did rely on same to their injury and loss of their property.

26. Defendant Cohen's letter to Plaintiffs' attorney Lawrence Moniz and dated 2/25/03.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Fraudulent asseverations that "Department believes it is appropriate to close your case".

MOTIVE: Furtherance of Scheme #3 in that this document's purpose was to lay a paper predicate to attest to the impartiality and genuine regard for Plaintiffs by Department of Social Services Defendants contrary to the allegations of gross misconduct as detailed in paragraphs 29-34, 141-149, 177, 222, 224, and 261. Defendant Cohen anticipated Plaintiffs' attorney's reliance upon her false and deliberately false misrepresentations of the status quo regarding Plaintiffs. Although Mr. Moniz did rely upon these statement to the injury of Plaintiffs, he was acting by virtue of what he believed was the truth, viz., that the case would be closed contrary to the content of paragraphs 161 and 224.

27. Defendant Keezell's letter mailed to Plaintiffs dated 9/26/04 and received by Plaintiffs in December, 2004.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Deliberately mailing letter to the wrong address; the pretence of an offer of a Fair Hearing. 940 days after Plaintiffs requested one; a false offer intentionally foreclosed by deliberately restricting Plaintiffs' response time to eight days.

MOTIVE: To finalize the complete and successful implementation of Scheme #3 as detailed in paragraph 40 of the Complaint by Department of Social Services and Sharon School Defendants and to furnish a last and crucial constitutional indignity by Defendants long accustomed to getting away with them. Defendant Keezell anticipated Plaintiffs' complete reliance upon his deliberate and fraudulent statements and Plaintiffs have relied on same to their permanent injury.

PREDICATE ACTS OF WIRE FRAUD

1. Defendant Verret's telephone call to Plaintiffs on or or about May 23, 2001.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Defendant's invitation to Plaintiffs to meet with the principal to "discuss" special education.

MOTIVE: Defendant Verret intended to dupe Plaintiffs into attending a planned meeting by conspiritor Defendants where six professionals would, according to that plan, hector and harass them into consenting to special education. Defendant Verret anticipated Plaintiffs' complete reliance upon her false statements and Plaintiffs did rely on same to their injury and loss of their property.

2. Defendants Verret, Kelly, and Alberton's telephone call to Plaintiffs' psychiatrist on or about June 3, 2001.

CIRCUMSTANCE OF FRAUD OR MISTAKE: This telephone call was made without the knowledge and in plain defiance of Plaintiffs' express refusal to consent; false statements were made, according to information and belief, concerning the nature, intent, and requirements of special education law; threats were made, according to information and belief, concerning the serious repercussions that would be forthcoming if the physician did not abandon his medical order for home tutoring forthwith.

MOTIVE: Defendants intended to coerce physician to assist them in the furtherance of Scheme #1 as detailed in paragraph 38 of

27

the Complaint. They anticipated the physician's complete reliance upon their threats and false statements and he did rely on same to Plaintiffs' injury and loss of their property.

3.  Defendant Loud's telephone call to Plaintiffs on or about October 6, 2001.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False statements were made concerning Defendant Loud's deep concern for Plaintiffs' daughter's educational status and her ignorance as to how such a problem could have arisen, her sincere desire to meet with Plaintiffs to resolve same and to "be on the same page" with Plaintiffs.

MOTIVE: Defendant Loud intended to dupe Plaintiffs into assuming she was acting in good faith and to provide a predicate meeting to cover her false assertion on October 25, 2001, to the Mass. Department of Education that Plaintiffs were "satisfied" with her plan to improve their daughter's instruction. Defendant Loud anticipated Plaintiffs' complete reliance upon her false statements and assertions of good will and Plaintiffs did rely on same to their injury and the loss of their property.

4.  Defendant Kyed's fax to Defendant Senges on or about February 28, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: False, concocted statements used to describe Plaintiffs as rigid, humorless parents who deliberately deprived their daughter of social relationships, discussions about homosexual congressmen, and toys; numerous fabrications of incidents purportedly observed by Defendant Kyed but deliberately and specifically invented by her to

28

excite DSS investigators' suspicions of child molestation.

MOTIVE:  Defendant Kyed intended to do her part to further Scheme #3 as detailed in paragraph 40 of the Complaint by larding her three page report with a series of seemingly artless inferences which DSS investigators, unhampered by constitutional restraints, could use to prosecute Plaintiffs and, at the very minimum, derail their advocacy of their daughter's educational rights.  Defendant Kyed anticipated Defendant Senges' complete and immediate reliance upon her fabrications and deliberate lies and Defendant Senges did rely on same to Plaintiffs' injury, peril, and loss of their property.

5.  Defendant Verret's fax to Defendant Senges on or about February 28, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Deliberate, false statement that cast doubt on the authenticity of Plaintiff's daughter's birth certificate; Defendant Verret's assertion that she had a lot more of the same kind of false statements in reserve in case Defendant Senges needed any more ammunition against Plaintiffs.

MOTIVE:  Defendant Verret intended to do her part in the furtherance of Scheme #3 as detailed in paragraph 40 by exciting DSS investigators' suspicions about the perverse character of the Plaintiffs.  Defendant Verret, by virtue of her authority as the School Nurse, anticipated Defendant Senges' complete reliance upon her false and deliberately false

29

statements and Defendant Senges did rely on same to Plaintiffs' injury, peril and the loss of their property.

6. Defendant Senges's three telephone calls to three of Plaintiffs' physicians on or about February 28, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Defendant Senges' improper solicitation of physicians to advocate for the special education of Plaintiffs' daughter as a necessary component of her education.

MOTIVE: Defendant Senges intended to "manufacture" physician support for Defendant Kelly's allegations against Plaintiffs to amplify the record against Plaintiffs that could be used to prosecute them. Defendant Senges anticipated the physicians' reliance upon her statements and also    Plaintiffs' reliance upon her "recounting" of these "conversations" with their physicians during her interrogation of Plaintiffs on March 6, 2002. Plaintiffs and physicians did rely on same to the Plaintiffs' injury, peril, and the loss of their property.

7. Defendant Hawkes-Sullivan's telephone call to Plaintiffs' psychiatrist on or about March 8, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE: Defendant's false, calculated statements about the nature and gravity of her investigation of Plaintiffs.

MOTIVE: Defendant Hawkes-Sullivan intended to dupe and to mystify the physician about the legal and technical use of the word "support" so that she could deliberately misconstrue his remarks of support for Plaintiffs and lie about them in her report to her superiors. She anticipated the physician's

30

reliance upon her false representations and statements and he did rely on same to Plaintiffs' injury, peril, and the loss of their property.

8.  Defendant Senges' telephone call to Plaintiffs on or about March 9, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE:  Defendant Senges' improper threat to Plaintiffs to cooperate with Defendant Hawkes-Sullivan's verdict of guilty or "things will get very messy".

MOTIVE:  Defendant Senges intended to provide a cover for her supervisor's lying report on Plaintiffs and her base and baseless verdict of guilty by extorting Plaintiffs' compliance with it and complaint.  Defendant Senges anticipated Plaintiffs' reliance upon her threat and Plaintiffs did rely on same to their injury, peril and the loss of their property.

9.  Defendant Thomas' telephone call to Defendant Kelly on or about June 17, 2002.

CIRCUMSTANCE OF FRAUD OR MISTAKE:  Defendant's improper contact with Defendant; collusion between Defendants to inflate the verdict of medical neglect against Plaintiffs to now include a demand that they consent to special education.

MOTIVE:  Defendant Kelly's motive was to further and to finalize Scheme #3 with the authority of DSS.  Defendant Thomas' motive was to aid and abet Defendant Kelly in her plan to finally ram special education down Plaintiffs' throats.  Each Defendant anticipated the reliance of the other and Defendant Thomas did rely upon and assent to Defendant Kelly's plan to Plaintiffs' injury, peril and the loss of their property.

31

JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a)  PLAINTIFFS**
Tinkham, Peter F.
Alexander, Juliet B.
Tinkham, Samantha L.

**(b)** County of Residence of First Listed Plaintiff   Franklin   (ME)
(EXCEPT IN U.S. PLAINTIFF CASES)

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Peter Tinkham and Juliet Alexander
Pro Se  P.O. Box 1075   Easton, MA
1-207-585-2137                    02334

**DEFENDANTS**   Kelly, Doreen R.

SEE ATTACHED

County of Residence of First Listed Defendant   Barnstable   (MA)
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

Attorneys (If Known)

05-10470 MLW

**II. BASIS OF JURISDICTION**   (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☒ 3  Federal Question (U.S. Government Not a Party)
- ☐ 2  U.S. Government Defendant
- ☐ 4  Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN**   (Place an "X" in One Box Only)

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from another district (specify)
- ☐ 6  Multidistrict Litigation
- ☐ 7  Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
RICO  18 U.S.C. § 1961 et seq. / 42 U.S.C. §1983,§1985,§1986
Brief description of cause:
Unlawful conversion of property / Violation of Constitutional right

**VII. REQUESTED IN COMPLAINT:**
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
DEMAND $
CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

**VIII. RELATED CASE(S) IF ANY**
(See instructions):   JUDGE _____   DOCKET NUMBER _____

DATE  3/10/05
SIGNATURE OF ATTORNEY OF RECORD   Peter Tinkham   Juliet Alexander   Pro se

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Tinkham, Peter F.
Alexander, Juliet B.
Tinkham, Samantha L.

**DEFENDANTS**

Kelly, Doreen R.

SEE ATTACHED

**(b)** County of Residence of First Listed Plaintiff  Franklin  (ME)
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant  Barnstable  (MA)
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)  Peter Tinkham and Juliet Alexander
Pro Se  P.O. Box 1075  Easton, MA  02334
1-207-585-2137

Attorneys (If Known)

05 - 10470 MLW

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
    Plaintiff

☒ 3  Federal Question
    (U.S. Government Not a Party)

☐ 2  U.S. Government
    Defendant

☐ 4  Diversity
    (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☒ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

Appeal to District Judge from Magistrate Judgment

☒ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
RICO 18 U.S.C. § 1961 et seq. / 42 U.S.C. §1983, §1985, §1986

Brief description of cause:
Unlawful conversion of property / Violation of Constitutional rights.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE _____ DOCKET NUMBER _____

DATE 3/10/05

SIGNATURE OF ATTORNEY OF RECORD
Peter Tinkham  Juliet Alexander  Pro se

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

FILED
IN CLERKS OFFICE

1. Title of case (name of first party on each side only) __Peter Tinkham v. Doreen R. Kelly__

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

05 - 10470

DISTRICT COURT
DISTRICT OF MASS.

[X]  I.      160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

[ ]  II.     195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
             740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.             for patent, trademark or copyright cases

[ ]  III.    110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
             315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
             380, 385, 450, 891.

[ ]  IV.     220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
             690, 810, 861-865, 870, 871, 875, 900.

[ ]  V.      150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

_____

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                        YES [ ]      NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)
                                                        YES [ ]      NO [X]
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                        YES [ ]      NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                        YES [ ]      NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                        YES [ ]      NO [X]

   A.   If yes, in which division do all of the non-governmental parties reside?
        Eastern Division [ ]          Central Division [ ]          Western Division [ ]

   B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

        Eastern Division [X]          Central Division [ ]          Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court?  (If yes, submit a separate sheet identifying the motions)
                                                        YES [ ]      NO [ ]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME _____Peter Tinkham and Juliet Alexander, Pro se_____
ADDRESS _____P.O. Box  1075     Easton   MA    02334_____
TELEPHONE NO. _____207-585-2137_____

(CategoryForm.wpd  - 2/15/05)